[No. 31422. *En Banc.* December 7, 1950.]

*In the Matter of the Estate of* SARAH ESTHER BORDEAUX, *Deceased.*[1]

*The Attorney General* and *William C. Klein, Assistant,* for appellant.

*Ryan, Askren & Mathewson,* for respondents.

[1] Reported in 225 P. (2d) 433.

Robinson, J.—This case involves the construction of the terminology of an inheritance tax statute. From a decision adverse to its contention, the inheritance tax division of the tax commission of the state of Washington has taken this appeal.

Chester Raymond Bordeaux and Russell Bordeaux were ten and five years of age, respectively, when their father, Thomas Bordeaux, married their stepmother, Sarah Esther Bordeaux, in 1900. They were brought up by their stepmother entirely as if she had been their natural mother, and the evidence is replete with indications that an unusually strong filial relationship existed between her and them. As Chester Raymond Bordeaux testified, "To all intents and purposes, she was our mother and we referred to her as such." This relationship continued after the death of Thomas Bordeaux, which did not take place until thirty-four years after the marriage.

Upon the death of Thomas Bordeaux, Sarah Esther Bordeaux inherited her share of the community property accumulated during the marriage, and, when she died in 1949, the bulk of this property passed, by virtue of her will, to her stepsons. (We employ the term "stepsons" advisedly here.) The problem before us is to decide into what class of beneficiaries Chester Raymond Bordeaux and Russell Bordeaux fall. The answer to this question will determine the amount of inheritance tax which is to be assessed against the property.

To the layman, at least, the inheritance tax statutes would appear to be explicit on the point. The pertinent portion thereof reads, in part, as follows:

"An inheritance tax shall be imposed on all estates, subject to this act and other inheritance tax acts of the State of Washington . . . at the following rates:

"Class A. Any devise, bequest, legacy, gift or beneficial interest to any property or income therefrom which shall pass to any grandfather, grandmother, father, mother, husband, wife, *child or stepchild,* adopted child or lineal descendant of any adopted child, son-in-law, daughter-in-law, or lineal descendant of the deceased is hereby denominated

as Class A." Rem. Supp. 1943, § 11202 [P.P.C. § 974-21]. (Italics ours.)

In spite of this apparently unequivocal language, appellant asserts that Mrs. Bordeaux's legacy to her stepsons falls, not within class A, but, rather, within class C, which includes all bequests made to those individuals not enumerated in either class A or class B (the latter classification covering only bequests to brothers and sisters). Bequests falling within class A are taxed at markedly lower rates than those falling within class C, and if the contention of appellant is sustained, the effect will be to increase the amount of inheritance tax due from $20,305.08 to $76,180.78. Appellant's argument that this would be proper is based upon its view that Chester Raymond and Russell Bordeaux were not, in legal effect, "stepchildren" of Sarah Esther Bordeaux at the time of her death.

No one disputes, of course, that Chester Raymond and Russell Bordeaux were "stepchildren" of Sarah Esther Bordeaux until the death of their natural father; and there can be little doubt that, in the popular understanding of the term at least, they remained such even after this took place.

Webster's New International Dictionary defines "stepchild" simply as "a child of one's wife or husband by a former marriage," and this is also the usual legal definition. See *Sharp v. Borough of Vineland,* 14 N. J. Misc. 256, 183 Atl. 911; *Dangerfield v. Indemnity Ins. Co.,* 19 So. (2d) (La. App.) 598; *Lunceford v. Fegles Constr. Co.,* 185 Minn. 31, 239 N. W. 673. But it is the contention of appellant that, upon the death of Thomas Bordeaux, something called the "tie of affinity" was severed, with the result that Chester Raymond and Russell Bordeaux automatically ceased to be stepchildren of Sarah Esther Bordeaux, and became, instead, legal strangers to her. This proposition, difficult to understand on its face, becomes even more anomalous when note is taken of one additional point. Thomas and Sarah Esther Bordeaux had one child, a half brother to Chester Raymond and Russell, who died in infancy. It appears to be conceded by all that had this child been alive at the time of the death of Sarah Esther Bordeaux, Chester Raymond

and Russell would still have been "stepchildren" and entitled to take as class A beneficiaries, even though their natural parent had died. For then the "tie of affinity" would not have been broken, since the living issue of the marriage in whose veins the blood of both parties was commingled, would have continued to preserve the relationship. *Paddock v. Wells*, 2 Barb. Ch. (N.Y.) 331; *In re Sheard's Estate*, 181 Wash. 62, 42 P. (2d) 34. The child having failed to outlive Sarah Esther Bordeaux, however, according to the view of appellant, the right of Chester Raymond and Russell Bordeaux to be considered her stepchildren terminated prior to her death. See *Abbe of Stratford's Case*, Year Book 10, Henry VII, 7, pl. 13.

Now all of the reasoning above set forth has a dubiously logical foundation in certain medieval premises which we will presently explore; but it makes very little common sense. Indeed, appellant does not contend that it does, but urges that we are required to adopt it because of our prior decision in *In re Raine's Estate*, 193 Wash. 394, 75 P. (2d) 933, which indubitably held, in construing a predecessor of the statute in question, that the legislature, by its use of the word "stepchild," intended to benefit only those children whose natural parents outlive their stepparents, unless, as we have noted, the stepparents and natural parents happened to leave issue surviving them. We have reexamined this case in detail in order to determine whether the principle of *stare decisis* really renders it incumbent upon us to affirm its central thesis, a proposition characterized by the trial court as "artificial," "technical," and "legalistic." Our conclusions are: (1) That the dictum from *In re Bousman's Estate*, 182 Wash. 64, 44 P. (2d) 1038, upon which the *Raine* case was based, is erroneous, and founded upon a misunderstanding of the meaning given by the courts both to the term "affinity" and to the term "stepchild," and (2) that, in any event, the holding in the *Bousman* case, rather than the dictum contained therein, was controlling, and should have been followed in the *Raine* case. Had this view of the matter been taken, the legislature would have been held to have intended the common

meaning of the word "stepchild," rather than the somewhat fanciful significance which this court, instead, assigned to it.

It should already be apparent that we are here dealing with an extremely recondite branch of the law. Yet, as was observed in *Brotherhood of Locomotive Firemen and Enginemen v. Hogan*, 5 F. Supp. 598, "there has been a striking absence of any extended discussion or reasoning," concerning the subject. For this reason, in order to understand the *Raine* case, it will not suffice to dismiss the matter with perfunctory discussion of one or two authorities, and we have found it necessary to digress at unusual length upon the legal history which preceded and led up to that decision.

As we shall attempt to show, the term "affinity" is not susceptible of precise definition. Broadly speaking, however, it may be regarded as the connection existing in consequence of marriage between each of the married persons and the kindred of the other. It is distinguished from consanguinity, which denotes relationship by blood. *Carman v. Newell*, 1 Denio (N.Y.) 25. For our purposes, the abstract idea of "affinity" appears to have originated with the medieval church. The canon law, which was in this respect derived from the Jewish law, prohibited marriage within certain degrees of consanguinity. See Coke's Institutes, Part II, p. 683. Further, it was an axiom of this law that the sexual union makes man and woman one flesh, and from this it was thought logically to follow that one's relatives by affinity occupied the same status as one's blood relations. See *Butler v. Gastrill*, Gilb. ch. 156, 25 Eng. Rep. R. 110; Blackstone, Commentaries (Lewis. Edition), Book 1, ch. 15, p. 435 (Christian's Note). In consequence, the same impediment to marriage existed in the case of relationship by affinity, as in the case of relationship by consanguinity. Tiffany, Domestic Relations (3d ed.), p. 27, § 15. A marriage, for example, between a man and his deceased wife's sister was thought to be little less objectionable than a marriage between a man and his own sister. See *Elliott v. Gurr*, 2 Phill. Ecc. 16, 161 Eng. Rep. R. 1064.

Just how far relationship by affinity actually extended was a problem which was the cause of considerable dispute.

The church, following through with "relentless logic" the principle that man and wife are one, at first took the position that a husband must be related by affinity to the wives of his wife's kinsmen; and, at one time, a man might not marry his wife's brother's wife, his wife's first cousin's wife, or even, by virtue of a further extension of the theory, his wife's sister's husband's (second) wife. Pollock & Maitland, History of English Law, Book 2, ch. VII, p. 388. But this extreme position was later modified; and it was said that, "though a man is related to his wife's brother by affinity, he is not so to his wife's brother's wife, whom, if circumstances would admit, it would not be unlawful for him to marry." Blackstone, Commentaries (Lewis Edition), Book 1, ch. 15, p. 435 (Christian's Note). It is important to note that throughout all of this there was no suggestion whatever of the principle, upon which appellant in the case at bar relies, that the tie of affinity is severed upon the death, without issue, of one of the parties to a marriage. Quite the contrary; the theory of the continuance of the tie was obviously the *basis* of the idea that a husband should be prohibited from marrying any relative of his deceased wife. As we shall now endeavor to show, the concept that the tie of affinity is severed upon the death of one of the parties to a marriage arose independently, and in connection with an entirely different problem.

Under English law, upon a full body of twelve persons being assembled in the jury box, the right of challenge arises. Challenge is of two kinds, (1) challenge to the array, or exception taken to the whole panel of persons returned by the sheriff, by reason of matter personal to himself, and (2) challenge to the polls, or exception taken to individual members of the jury. 19 Halsbury's Law of England (2d ed.), pp. 303-306, §§ 630-636. Affinity—relationship by marriage between the sheriff or one of the jurors, and one of the parties,—was early made a ground of principal challenge, as may be seen from an examination of a note to the New York case of *Cain v. Ingham*, 7 Cowen 478, in which numerous cases reported in the Year Books are reviewed. But—and this is the crux of the matter—it is apparent that,

from the outset, "affinity," as the word was used in determining the qualifications of jurors, and "affinity," as it was employed in determining the right of individuals to marry, had two different meanings. The rules for determining whether a juror was too closely related to a party to an action to serve, and the rules for determining whether a man was too closely related to a woman to legally marry her, were not at all the same. Thus, Sir Henry Finch's *Law* (1678), cited in a note to *Cain v. Ingham, supra,* draws on the Year Books (7 Henry VII 2) as a source for the maxim that, "It is no principal cause of challenge to a juror that he hath married the party's mother, if she be dead without issue; for the cause of favor is removed." It does not appear that the cited case held, as a general rule, that the tie of affinity was broken upon the death of the "party's mother." Indeed, assuming the party was a daughter, and had this juror attempted to marry her, such a marriage would have been clearly voidable, on the grounds that the affinity subsisting between them would render the marriage illegal. *Blackmore v. Brider,* 1 Hag. Con. 393, 161 Eng. Rep. R. 593, note; 2 Phill. Ecc. 359, 161 Eng. Rep. R. 1169. See annotation, L.R.A. 1916C 756. But it did hold, or has been interpreted as holding, that, upon the death of the juror's wife, the affinity between himself and his stepchild, *for the purposes of determining his right to serve on the jury,* was terminated.

*Mounson and West's Case,* 1 Leon. 88, 74 Eng. Rep. R. 82, has been regarded as further defining the circumstances in which a juror, or the entire jury, would be disqualified by reason of the affinity of the juror, or of the sheriff who summoned him, to one of the parties. The case involved a challenge to the array, on the ground that the sheriff had married the plaintiff's first cousin. The latter had died, but there was issue surviving. The challenge was upheld. The comment on this case in Coke upon Littleton, Butler & Hargrave's Notes, which has frequently been cited by American courts in discussions of this matter, follows:

"Having issue living by the wife, though she is dead, is sufficient to continue the husband's affinity." 1 Coke upon Littleton, § 156a, note 2.

It is important to observe that the quoted statement, all-inclusive though it may appear when extracted from the context, was only intended to have reference to "affinity," as that term was defined in connection with the competence of a sheriff to summon a jury in a particular case. See, also, 1 Coke upon Littleton, § 157a, and note 6 thereto, wherein it was said that the same rule applied in determining grounds for disqualification of individual jurors. The limited scope of these comments has frequently been ignored by courts which have cited them as authority. See discussion of this matter in *Zimmerer v. Prudential Ins. Co. of America*, 150 Neb. 351, 34 N. W. (2d) 750.

It would seem, therefore, that, for purposes of determining the rights of individuals to marry, affinity between a man and his wife's kindred was considered to continue after her death; but that, for purposes of determining the right of a man to serve on a jury, in a case, for example, where one of his wife's kindred was a party, his affinity with the latter ceased upon his wife's death, unless issue survived to perpetuate the connection. The word "affinity" seems to have been loosely used in both contexts, just as the word "relationship" might have been. In such a situation, confusion was probably inevitable, and to see how it developed we have only to turn to the American cases.

From the beginning, it was recognized, in the American courts, that relationship with one of the parties, either by consanguinity or affinity, was good cause of challenge to a juror (Proffatt on Jury Trial, p. 228, § 174). In general, however, the courts adopted the principle that the tie of affinity existing between a juror and a party to the action was broken by the dissolution of the marriage which had produced it. A leading case is *Bigelow v. Sprague*, 140 Mass. 425, 5 N. E. 144, opinion by Judge Holmes; others are *Goodal v. Thurman*, 38 Tenn. 118; *Wilbe Lbr. Co. v. Calhoun*, 163 Miss. 80, 140 So. 680; and *Gillespie v. State*, 168 Ind. 298, 80 N. E. 829. See, also, *Carman v. Newell*, 1 Denio (N.Y.) 25; and *Yerby v. Martin* (Tex. Civ. App.), 38 S. W. 541, which cases applied this principle to uphold the competency of

judges. And, as a corollary to this proposition, it was held, again in apparent accordance with the early English law, that, if issue survived the marriage, the affinity continued, and the juror was incompetent to serve. Cases in point are *Jaques v. Commonwealth*, 10 Grat. (Va.) 690; *Shamberger v. State*, 221 Ala. 538, 130 So. 70; *Dearmond v. Dearmond*, 10 Ind. 191; *Stringfellow v. State*, 42 Tex. Crim. App. 588, 61 S. W. 719; *Crosby v. State*, 90 Fla. 381, 106 So. 741; *Miller v. State*, 97 Ga. 653, 25 S. E. 366; and *Walsingham v. State*, 61 Fla. 67, 56 So. 195; and see *Vannoy v. Givens*, 23 N. J. L. 201; *Pegues v. Baker*, 110 Ala. 251, 17 So. 943; *Parks v. Citizens Bank of Valdosta*, 40 Ga. App. 523, 150 S. E. 438; and *Paddock v. Wells*, 2 Barb. Ch. (N.Y.) 331 (contra *Winchester v. Hinsdale*, 12 Conn. 87; *Trout v. Drawhorn*, 57 Ind. 570; and *Zimmerer v. Prudential Ins. Co. of America*, 150 Neb. 351, 34 N. W. (2d) 750), where this principle was applied to disqualify judges. But, as with almost every aspect of this uncertain field, the decisions, even on these points, were not uniform. *Spear v. Robinson*, 29 Me. 531, 545, involved a case where a justice of the peace had once been married to a sister of the plaintiff. His wife was deceased, and no issue survived; but the court declared him incompetent to sit, using the following language:

"By the marriage, one party thereto holds by *affinity* the same relation to the kindred of the other, that the latter holds by *consanguinity*. And no rule is known to us, under which the relation *by affinity* is lost on a dissolution of the marriage, more than that by blood is lost by the death of those, through whom it is derived; the dissolution of a marriage, once lawful, by death or divorce, has no effect upon the issue; and it is apprehended, it can have no greater operation to annul the relation by affinity, which it produced."

This decision has been regarded with disfavor by some later courts (see *Brotherhood of Locomotive Firemen and Enginemen v. Hogan*, 5 F. Supp. 598, discussed *infra*), as well as by the writer of appellant's brief in the case at bar, on the grounds that it is inconsistent with other cases on the same subject, and unsupported by authority. Inconsistent it certainly is, if the matter of determining the quali-

fications of a justice of the peace be regarded as analogous to the problem of determining the qualifications of a juror (as seems generally to have been the case in the United States; see, however, *Zimmerer v. Prudential Ins. Co. of America, supra* and cases there cited). But it will be seen that the broad statement that the relationship by affinity is not terminated by death is in entire accord with the original concept of affinity developed in connection with the laws concerning marriage. Had the quoted statements been made in a context other than one involving the qualifications of a judge or jury, no quarrel could be had with them on the ground that they lack corroborative common-law authority. Indeed, Mr. Thompson, in his well-regarded work on real property, uses *Spear v. Robinson* as principal authority for the broad statement that an affinity relationship "is no more lost by the dissolution of the marriage than the relationship by blood is lost through death," although this observation would seem quite erroneous to anyone familiar with the jury cases alone. 5 Thompson on Real Property (Perm. ed.) 116, § 2410.

But *Spear v. Robinson* was an isolated case. As has been shown, the trend of authority in the cases concerned with the qualifications of judges or jurors, was to follow the English decisions which had been made with respect to jurors and to the summoning sheriffs. The English law was not followed, however, in most of the cases involving the legality of marriage. Although some states, influenced by the canon law, continued the prohibition of marriage between a man and the relatives of his deceased wife (*Commonwealth v. Perryman*, 29 Va. 779), the more general feeling in this country did not condemn such marriages. See Story on Conflict of Laws (8th ed.), p. 194, § 115; Annotation, L. R. A. 1916C, p. 756. Similarly, sexual relations between parties connected only in this manner were not regarded as incestuous; and it was held that a statute punishing cohabitation between a man and his stepdaughter had no application where the marriage creating the relationship had been dissolved, since "It is established law that the relation of stepfather and stepdaughter, *at least*

*within the meaning of the statutes against the crime of incest,* terminates with the death or divorce of the mother." *Noble v. State,* 22 Ohio St. 541. (We have added the italics to emphasize a caution not characteristic of later cases.) At least one reason for taking this position with respect to the incest statutes is suggested by the later case of *State v. Brown,* 47 Ohio St. 102, 23 N. E. 747, 21 Am. St. 790. It is there indicated that there is some reason for holding cohabitation between parties related only by marriage as less reprehensible than that between parties related by consanguinity; and the court further says:

"The supposed hardship of the law is much mitigated by the circumstance that kinship by affinity of the husband and wife, respectively, with the family of the other terminates with the dissolution of the marriage."

This reasoning, of course, was entirely contrary to the English view of the matter. A number of the earlier courts were familiar with that view, and knew that, in England, a man could not marry, for example, the sister of his deceased wife, on the theory that the affinity between them did not cease with the latter's death. Apparently feeling that there was an inconsistency between this idea and the doctrine that affinity between a juror and a party related to his deceased wife *had* terminated upon her death, these courts felt compelled to rationalize the two, rather than recognizing that two completely different problems were involved. They did this by pointing out that, in America (at least in the states in which the respective courts happened to be located), a man *could* marry his deceased wife's sister. It followed, therefore, that, in America, it was the law that the tie of affinity was broken upon death; *ergo,* a judge, juror, or other officer of the court, whose only connection with a party to the case in question was through his deceased wife, was qualified to serve. *Winchester and Colebrook v. Hinsdale,* 12 Conn. 87; *Blodget v. Brinsmaid,* 9 Vt. 27. Needless to say, the same result could have been reached solely by reliance on the English cases involving the qualifications of jurors and without any reference to abstract ideas of affinity.

However, this sort of reasoning helped establish the idea that "relationship by affinity ceases upon the dissolution of the marriage that created it" (in the language of the headnote to *Blodget v. Brinsmaid*), and for many years this proposition was cited to prove (1) that a judge or juror could serve in a case even though he was related to one of the parties through his deceased wife (in support of which proposition, see the cases cited *supra*), and (2) that marriage or cohabitation between parties, related only through the deceased wife of one of them, was not incestuous and was not forbidden. *Back v. Back*, 148 Iowa 223, 125 N. W. 1009, Ann. Cas 1912 B, 1025; *Henderson v. State*, 26 Ala. App. 263, 157 So. 884; *Johnson v. State*, 20 Tex. App. 609, 54 Am. Rep. 535; *Wilson v. State*, 100 Tenn. 596, 46 S. W. 451, 66 Am. St. 789; *Tagert v. State*, 143 Ala. 88, 39 So. 293, 111 Am. St. 17; *Wilson v. State* (Conn. Superior Court), 6 Law Reporter 452. These latter cases relied in part upon *Noble v. State,* but, influenced by the reasoning of *Blodget v. Brinsmaid* particularly, they also invoked the jury cases in their support. This led to an interesting anomaly. The jury cases had held that, though the tie of affinity was broken upon death, it was not broken if issue survived the marriage. Although the reason which American courts gave for this exception was that the blood of the parties was commingled in the veins of a living person, and, therefore, that the tie of affinity had never been severed, the original reason for it appears to have been the feeling that a juror might be more partial to a party in the cause if he had a surviving child who might inherit from such party. See Jenk. 96, 145 Eng. Rep. R. 68. But *Tagert v. State, supra,* imported the exception into the incest cases, with the result that, in Alabama, one who cohabits with his deceased wife's daughter is only guilty of incest if his own child by such deceased wife is surviving at the time. In such a case, the daughter is a "daughter of his wife" within the meaning of the statute. But if the child is dead, or if there never was a child, she is no longer the "daughter of his wife, but in contemplation of law a stranger" (see *Wilson v. State*, 100 Tenn. 596, 46 S. W. 451), and cohabitation with her, though

it would seem to be scarcely less immoral, is not illegal. Texas has apparently not invoked this exception in the incest cases, and cohabitation with the daughter of a deceased wife is not there regarded as incest, regardless of whether issue survive. *Johnson v. State*, 20 Tex. App. 609.

Thus the cases continued to make the broad general statement that affinity was terminated by the death of one of the parties to the marriage which had created it. In practice, however, the principle was only invoked in the jury and incest cases which had originally given rise to it. So applied, the doctrine did little harm, and, in fact, in most cases, undoubtedly promoted justice. But the continual restatement of the principle, often without any qualification, led to a gradual acceptance of the idea that it had an abstract validity, independent of the jury and incest cases. In 1 Am. & Eng. Ency. of Law 913, under the title "Affinity," the statement was made that "the death of the spouse terminates the relationship by affinity," citing several cases all dealing with the qualifications of judges or juries. A more influential comment appeared in 2 C. J. 379, also under the title "Affinity," to the following effect:

"Death of the spouse terminates the relationship by affinity; if, however, the marriage has resulted in issue who are still living, the relationship by affinity continues."

Noted is an indiscriminate mixture of incest (or marriage) and judge and jury cases, but none of any other type, and this for the very good reason that no such cases existed at that time. See, also, the annotation to *Chinn v. State of Ohio*, reported in 11 L. R. A. 630, where it is said that "the death of the husband severs the tie of affinity, where there is no living issue of the marriage," citing once again a group of incest and jury cases.

However, there was developing, during this period, an important line of decisions which stood in direct opposition to the theory that the death of a spouse without issue terminates, in all situations, the affinity relationship between the surviving spouse and the kindred of the deceased. In contrast to the incest cases, and those involving the qualifi-

cations of a judge or juror, these cases were concerned with circumstances strikingly analogous to those presented by the case at bar. Most of them involved the construction of workmen's compensation acts or of statutes governing insurance policies issued by mutual or fraternal benefit societies; some involved the interpretation of the by-laws or constitutions of the societies themselves. Such statutes or by-laws, as is true of the statute involved in the instant case, often expressly indicated an intent to benefit stepchildren, stepparents, or in-laws; the plaintiffs, in the cases under discussion, were usually individuals who would have unquestionably occupied one of these relationships toward the respective decedents, had not their relatives by consanguinity, or spouses, through whom the relationships had been created, previously died. Not unanimously, but in an overwhelming preponderance of the cases, the courts have held that, in such situations, the steprelative, or in-law, is to be considered as remaining in this capacity, even after the death of the individual whose marriage brought the relationship into existence. In other words, these cases have held, either directly or by necessary implication, that, where statutes or by-laws of mutual benefit societies, have indicated an intent to benefit steprelatives or in-laws, the "tie of affinity" between these people and their relatives-by-marriage is not to be regarded as terminated upon the death of one of the married parties. This result has often been reached even where the term under construction was not "stepchild" or "stepmother" or the like, but rather some such general word as "relative" or "mother." Here, the decisions have first had to deal with the preliminary problem (not involved in this case, and concerning which there is no little dispute) of whether such terms included steprelations at all; and, having concluded that they did, these courts have then decided the question which concerns us here, with a holding that steprelations do not in all cases cease to be such upon the death of the party whose marriage gave rise to the relationship.

We shall first discuss the minority view, and there appear to be four cases which support it. *Brotherhood of*

*Locomotive Firemen and Enginemen v. Hogan,* 5 F. Supp. 598, will be dealt with in detail later. The other three cases arose in jurisdictions where it had been held, in both jury and incest cases, that death of the spouse terminates the relationship by affinity, thus giving that proposition a spurious general soundness. In *Allen v. Cunningham,* 143 Tenn. 11, 223 S. W. 450, it was held that the husband of a deceased daughter is not a son-in-law, within the meaning of a statute entitling a member of a mutual society to name a "son-in-law" as beneficiary of a death benefit certificate. The court held that the relationship of son-in-law and mother-in-law terminated upon the death of the daughter. It relied entirely upon the Corpus Juris comment heretofore cited, and upon two Tennessee cases therein referred to, one dealing with the qualifications of a juror, the other with incest. *Morey v. Monk,* 145 Ala. 301, 40 So. 411, held that a stepson was not a "relative" within the by-laws of a beneficiary association allowing relatives to be beneficiaries, where his mother had predeceased his father, the insured. The court apparently assumed that a stepson would be a "relative," if his mother had remained alive after the death of his father, but stated, on the authority of several jury and incest cases, that the tie of affinity between him and his father had been severed by his mother's death. *Doster v. United States,* 33 F. Supp. 23, interpreting Alabama law, followed this decision, stating that "whether or not death or divorce, in the absence of children, terminates a relationship by affinity is a matter of local law," an observation which in itself is sufficient to explain the result in the case.

Opposed to these holdings, which all depend upon the doubtful analogy of the jury and incest cases, are a much larger number of decisions in which the courts have recognized that, when construing the language of statutes granting benefits to certain classes of relatives, or when interpreting the by-laws of mutual or fraternal benefit societies having the same effect, they were confronted with an entirely different situation. Thus, in *Security Union Cas. Co. v. Kelly* (Tex. Civ. App.), 299 S. W. 286, the workmen's

compensation act provided that a stepmother of a deceased employee should be entitled to receive compensation upon his death. Claimant was the stepmother of the deceased, whose own father and mother had previously died. She was allowed to recover. This case was followed in *American General Ins. Co. v. Richardson* (Tex. Civ. App.), 132 S. W. (2d) 161, where the court said:

"We believe it was the legislative intent to place the stepmother in the same category in every respect as the mother in so far as concerns the benefits of the Act; and that for this purpose the relation was no more severed by death of the father in the one case than in the other."

*Simcoke v. Grand Lodge A.O.U.W.*, 84 Iowa 383, 51 N. W. 8, 15 L.R.A. 114, involved a beneficiary certificate issued to a member of a fraternal order. The controlling Iowa statute provided that no such corporation should issue a certificate of membership or policy to any person unless the beneficiary thereunder was a "husband, wife, relative, legal representative or heir" of the insured member. The deceased, whose mother had previously died, was survived by a stepfather, whom he had named as beneficiary in the certificate. The court held that the word "relative" included relatives by affinity, that a stepfather was a relative by affinity, and that the relationship continued after the death of the wife whose marriage created it. The stepfather was accordingly allowed to recover. The case, which is a leading one, relied upon *Spear v. Robinson* to support it. As has been shown, *Spear v. Robinson*, though representing, under its particular facts, a minority view, set forth a theory of affinity which, in general, was just as respectable, from a traditional standpoint, as the contrary theory relied upon by most of the courts in the other cases involving disqualification of judges and jurors.

Following the *Simcoke* case was *Faxon v. Grand Lodge Brotherhood of Locomotive Firemen and M. E. Rhea*, 87 Ill. App. 262. In this case, the statute provided that, in the case of fraternal benefit societies, payment of death benefits should only be made to the "families, heirs, blood relations, affianced husband or affianced wife of, or to persons

dependent upon, the member." The constitution of the brotherhood provided that its beneficiary department was established to provide relief to members and their families. The brotherhood had issued a beneficiary certificate to the deceased. His father died before him, but even so, upon his own death, his stepmother was permitted to claim the fund in question as a relative by affinity.

In *McGaughey v. Grand Lodge A.O.U.W.*, 148 Minn. 136, 180 N. W. 1001, the constitution of a fraternal benefit society provided that the purpose of its beneficiary fund was the protection of individuals related to its members either by blood or marriage, and specified "mother" as one of these relatives. The deceased, whose father had died, was survived by his stepmother, and she was permitted to recover on his benefit certificate, on the theory, first, that the word "mother" in the constitution included a stepmother, and second, that her affinity relationship to her stepson had not terminated upon the death of her husband, his father.

*Hernandez v. Supreme Forest Woodmen Circle* (Tex. Civ. App.), 80 S. W. (2d) 346, was concerned with the construction of a Texas statute which regulated insurance issued by fraternal societies. The statute authorized such societies to pay death benefits to "stepchildren," as well as to others therein specified. The deceased, a widow, specified the illegitimate daughter of her husband as beneficiary in his certificate of insurance in the association. The court, apparently, did not even consider that the prior death of the widow's husband might have terminated the affinity relationship existing between the former and the child of the latter, but was largely concerned with the question of whether the child's illegitimacy would prevent her being considered the widow's stepchild. It held that she was such a stepchild, within the meaning of the workmen's compensation statute, and, as such, entitled to recover under the benefit certificate.

The law of Wisconsin seems to have been established by the case of *Renner v. Lodge of Bohemian Slavonian Benevolent Society*, 89 Wis. 401, 62 N. W. 80. This case construed

the charter of a benefit society which provided that its purpose was "to assist and give pecuniary aid to the widows and orphans of deceased members." It was held that "orphans" included a stepchild, whom the deceased had designated as beneficiary. The case is not inconsistent with the theory of the jury and incest cases that the tie of affinity is broken upon the death of the spouse whose marriage created it; for it appeared that this spouse, the mother of the stepchild in the case, survived her husband. The tenor of its reasoning, however, was adopted in *Jones v. Mangan*, 151 Wis. 215, 138 N. W. 618, a case in which the insured, a member of the association in question, named his stepmother as beneficiary in his benefit certificate, his natural father having died. The constitution of the association provided that an insured could designate his "mother" as beneficiary. The court held that the word "mother" included a mother by affinity, and further said:

"It is obvious that in many cases the stepmother may have strong claims upon the child whom she cares for during minority, and no reason appears to us why such child should not have the right, under the articles of association in this case, to make the stepmother the object of his bounty."

The stepmother was accordingly allowed to recover the fund in dispute.

An especially interesting case belonging to this group is *Hummel v. Supreme Conclave Improved Order Heptasophs*, 256 Pa. 164, 100 Atl. 589. This was an action brought by the designated beneficiary on a benefit certificate issued by a fraternal corporation to her deceased stepfather. The Maryland statute under which the association was incorporated provided that benefits could be made only to "children." The beneficiary's natural mother had died, and the court apparently regarded the affinity relationship between the daughter and her stepfather as terminated. But the court discussed the legislative purpose in enacting the statute, which it found to be "to afford an opportunity to a member to assist after his death, one or more of his family or those who, though not related to him, are members of

his household and hold like intimate relations with him";
and, basing its decision on this consideration, held that the
legislature, in its use of the word "children," had not in-
tended to confine itself strictly to a class related by blood
or affinity. Its exact words were as follows:

"We think that 'children' in the statute was intended to
include those who stood in that relation to the head of the
house, though not related by blood or affinity. In the case in
hand, it is clear, under the evidence, that the plaintiff held
the relation of a child to the deceased. . . . She had
borne his name from her infancy until her marriage, and,
as the evidence conclusively shows, he had treated her from
her infancy as his child."

But not all of these decisions involved workmen's com-
pensation acts or the insurance policies issued by mutual
or fraternal benefit societies. Two of the most significant
of the cases in this field are *Steele v. Suwalski*, 75 F. (2d)
885, 99 A. L. R. 588, and *Benefield v. United States*, 58 F.
Supp. 904. The first case, decided in 1935 by the circuit
court of appeals, seventh circuit, involved the construction
of the war risk insurance act, § 402, as amended, 38 USCA,
§ 511. The deceased soldier had been issued a war risk
insurance policy in the sum of ten thousand dollars, and had
designated the widow of his brother as cobeneficiary with
his father. The law permitted a sister-in-law to be named
as beneficiary, and this suit was brought by his brother's
widow to recover under the policy. It was contended that
she could not recover under the authority of the cases hold-
ing that the relation of brother-in-law and sister-in-law
being one of affinity, the death of the spouse whose mar-
riage gave rise to the relationship terminates it where there
is no surviving issue. The court observed that most of the
cases supporting this thesis involved incest and the quali-
fications of a judge or juror; and it was pointed out that,
where the construction of an insurance policy was before
the court, the result had usually been quite different. The
court stated:

"Where the relationship by affinity is in fact, as it was
in this case, continued beyond the death of one of the parties
to the marriage which created the relationship, and where

the parties continue to maintain the same family ties and relationships, considering themselves morally bound to care for each other, the District Court properly found that the relationship continued to exist and that appellee, in this case, was the sister-in-law of the deceased veteran within the meaning of 38 USCA § 511."

The *Benefield* case, decided by the district court of the southern district of Texas, involved the construction of the National Service Life Insurance Act of 1940, §§ 1 *et seq.*, and amendments, 38 USCA §§ 801 *et seq.* The insured married a woman who had had a daughter by a previous husband. They were subsequently divorced, but the insured continued to make contributions for the support of this girl, whom he frequently referred to as his daughter, and corresponded with and saw from time to time. Relying on the above-quoted portion of *Steele v. Suwalski*, the court determined that the relationship by affinity between father and stepdaughter continued to exist even after the divorce between the former and the mother of the latter, in view of the fact that the mutual relationship of the two continued as it had before. Distinguishing such Texas incest cases as *Johnson v. State, supra,* and such jury cases as *Stringfellow v. State, supra,* on the ground that they involved different problems, the court held that the stepdaughter was entitled, as designated beneficiary, to recover under the policy.

The case which, in its fact situation, perhaps most closely approximates the case at bar, is *Lewis v. O'Hair* (Tex. Civ. App.), 130 S. W. (2d) 379. In that case, the Texas statute under construction provided that the "wife of a son" was among the persons to be placed in class A for inheritance tax purposes. Plaintiff was the daughter-in-law of the testator and testatrix, who had made certain bequests to her. Her husband had previously died. She had had two children by him, who were living, so that, even under the application of the doctrine of affinity as it had been invoked in the incest and jury cases, the affinity would have been held to have continued after his death, and she could still properly have been considered the daughter-in-law of

his parents. The court recognized this, citing the case of *Stringfellow v. State, supra.* However, it chose to make this argument only an alternative ground for its decision that the plaintiff was entitled to be placed in class A. As the Pennsylvania court had done in *Hummel v. Supreme Conclave Improved Order Heptasophs, supra*, it recognized the possibility that affinity might terminate upon the death of the spouse whose marriage gave rise to it; but held that that technical rule was simply inapplicable in a case such as the one before it. Said the court:

"Nor do we think with the holdings with relation to laws prohibiting marriage between those related within certain affinal degrees furnish a pertinent analogy. Our problem here is to ascertain the legislative intent from the statutory language employed; and is not controlled by the existence vel non of a legally recognized affinal relationship."

Explaining this view, the court stated, in language which has a particular cogency with reference to the case at bar:

"In the generality of cases—and in classifying for taxing purposes only the generality can be taken into account—the considerations which would motivate a father- or mother-in-law to provide for the daughter-in-law would be at least as cogent after as before the death of the son. So also would be the considerations motivating legislative classification in this regard. These considerations are so obvious as not to require statement or elaboration.

"We think therefore the legislative intent to make no distinction between the wife of a living husband and the surviving wife of a deceased husband can be drawn from the article without doing violence to its language."

Obviously, what was said in this case concerning parents and a daughter-in-law may be applied with equal force with reference to a parent and his or her stepchild. Paraphrasing the concluding sentence of the quotation, it may be said, with reference to the statute under construction in the present inquiry, that the legislative intent to make no distinction between the child of a living parent and the surviving child of a deceased parent, can be drawn from the statute without doing violence to its language.

Appellant insists that these cases are unimportant, for

the reason that they conflict with the law in Washington, as established in the *Raine* case. At least, however, they indicate that the word "affinity" has an exceedingly protean signification and that the phrase "death of a spouse terminates the relationship by affinity" is meaningless when removed from context; and they show further that the majority of courts have refused to apply this latter principle when it would conflict with an obvious intent, legislative or otherwise, to benefit a class of relatives whose right to the benefit arises, not from the technical relationship existing between themselves and their benefactor, but from the fact that they are, in sum and substance, of his immediate family group. With this in mind, we turn to the Washington cases. First, however, it will be necessary to discuss, at some little length, *Brotherhood of Locomotive Firemen and Enginemen v. Hogan*, 5 F. Supp. 598, upon which, directly or indirectly, they chiefly rely.

The facts in this case are extremely different, either from those in the case at bar or from those in the Washington cases which have followed its reasoning. The Brotherhood, a fraternal beneficiary society, issued a certificate to the decedent whereby it promised to pay his named beneficiary a certain sum. He designated his wife as beneficiary. She had been previously married, and had had four children by this marriage; no children were born as the result of her marriage to decedent. Later, the parties were divorced. The record was silent as to the disposition of her children, but she married again, and both she and her third husband subsequently died. Some twenty-five years after the divorce, decedent died also, without ever having changed the designation of his wife as beneficiary under the policy. He left surviving him a sister and brother who were defendants in this action, which was brought by the Brotherhood by bill of interpleader. Additional defendants were the four children of his divorced wife by her first marriage. All of these defendants claimed the proceeds of the beneficiary certificate as next of kin under the constitution of the Brotherhood. The constitution provided that, in the event there was no legally designated beneficiary, the fund should

be paid, first to the widow, second to the child or children, third to the mother, fourth to the father, and fifth to sisters and brothers equally. It further provided that "the term of child or children shall include stepchildren." The problem before the court was whether or not the four children of decedent's wife were his "stepchildren" at the time of his death, since, if so, they were entitled to the proceeds of the policy. The court put the matter as follows:

"The question presented to the court, however, is whether or not the relationship of stepfather and stepchildren was extinguished by the subsequent decree of divorce which absolutely dissolved the marriage relationship which gave rise to the kinship of affinity."

It was readily apparent that, from an equitable standpoint at least, the claim of these children to take as stepchildren of the decedent was exceedingly weak. Twenty-five years had elapsed since the dissolution of the marriage between their mother and quondam stepfather, and the court stated:

"While there is no showing as to the whereabouts of the children after 1907, one will not assume that twenty-five years after the divorce which was obtained by their mother, and with the intervening marriage to Benson, these children remained a part of the insured's family, and occupied a relationship with him of father and children. . . . It must be clear that, as used in the policy, the term 'stepchild' contemplated the filial relationship that is so commonly observed between stepfather and stepchild."

The court then quoted the comment of Corpus Juris (to which we have previously referred), to the effect that death of the spouse terminates the relationship by affinity, and reviewed *Morey v. Monk,* and a number of the jury and incest cases cited in the above-mentioned comment, as supporting this proposition. Following this, it took note of the contrary holdings in *McGaughey v. Grand Lodge* and *Simcoke v. Grand Lodge, supra,* and concluded that, if they were predicated upon the authority of *Spear v. Robinson,* which both of them had cited, they were based on a deci-

sion which expressed the minority view. But the court went on to say:

"There were individual circumstances in the Minnesota and Iowa cases that may have influenced the court to adopt the views expressed therein without a thorough consideration of the effect of the dissolution of marriage. In the *McGaughey* Case, the insured lived with and continued the filial relationship with the so-called stepmother, and there was, in fact, the apparent relationship of mother and son even after the father's death. A denial of plaintiff's claim to the proceeds of the policy in that case would have resulted in a forfeiture to the company. In *Simcoke v. Grand Lodge* and *Anderson v. Grand Lodge,* the insured had specifically designated the plaintiff as the beneficiary to receive the proceeds."

At this point, it is perhaps worthy of passing note that, in the case at bar, the stepmother not only maintained family ties with the children even after their father's death, but also specifically designated them as beneficiaries in her will.

The court continued:

"But even though it should be contended that the relationship by affinity continues after the dissolution of the marriage by death, the same rule may not necessarily follow where, without issue, the marriage relationship is extinguished by divorce."

After elaborating on this point, the court concluded as follows:

"Upon consideration of all the facts and circumstances of the case—the marriage without issue, the divorce and subsequent remarriage, the absence of any testimony or showing that these children ever were, or ever considered themselves to be, a part of the insured's family, and the purposes of this fraternal insurance—it is clear that the court must confine these claimants to the clear, unambiguous, and generally accepted definition of the term 'stepchild.' No occasion is presented which suggests that there should be any deviation from the interpretation that is generally followed by the weight of authority. It follows, therefore, that the brother and sister, as next of kin in the designated classes under the constitution, are entitled to this insurance fund."

On the basis of this reasoning, the court departed from the conclusion which had been reached in nearly all of the cases involving insurance policies, and, adopting the rule of the incest and jury cases, held that the tie of affinity, under all of the circumstances ·of the particular case, was severed upon dissolution of the marriage by divorce. The opinion is so interspersed with qualifications, however, and the court makes it so clear that the decision is based entirely on the peculiar state of facts before it, that the case can hardly be considered controlling in any other situation. Indeed, it is quite clear that had the marriage involved been terminated by death, and had the stepchildren continued to live as members of their mother's husband's household, the court might well have reached the orthodox result, only to be regarded as a "deviation" if the jury and incest cases are considered binding in a case of this type.

It was this case, however, upon which our court placed its chief reliance in pronouncing the dictum upon which the *Raine* case was ultimately based. *In re Bousman's Estate*, 182 Wash. 64, 44 P. (2d) 1038, was brought under a predecessor of the statute under consideration in the case at bar. The statute (Rem. Rev. Stat., § 11202), as quoted in the opinion of the court, then read as follows:

" 'The inheritance tax shall be imposed on all estates sub-ject to this and other inheritance tax acts of the State of Washington, at the following rates.

" 'If passing to or for the use of a father, mother, husband, wife, lineal descendant, stepchild, or lineal descendant of a stepchild, adopted child or lineal descendant of an adopted child of the decedent, or to a son-in-law or a daughter-in-law of the decedent, *being in such relation*, the tax shall be one per centum of any value not exceeding fifty thousand dollars . . . Provided, however, that in the above cases, ten thousand dollars of the net value of any estate so passing shall be exempt from such tax when passing to the surviving spouse of the decedent, or to the father or mother of the decedent and five thousand dollars shall be exempt to each lineal descendant, each stepchild, each adopted child and each lineal descendant of an adopted child and each *son-in-law* or *daughter-in-law* of the decedent, *such son-in-law*

*or daughter-in-law being in such relation at the time of the death of said decedent.'* (Italics ours.)"

The facts of the case were that Mary Bousman had married Joseph Bousman who had an infant son at the time of the marriage. Joseph Bousman predeceased her, and, when she died, she devised certain property to his son. The property was less than five thousand dollars in value, and the son, contending that he was a stepchild within the meaning of the above statute, argued that, by virtue of the terms thereof, no tax was due.

It will be seen that this case presented an entirely new situation in which it was urged that the tie of affinity is broken upon the death, without issue, of the spouse whose marriage created it (*Lewis v. O'Hair, supra,* which involved somewhat similar facts, not having as yet been decided). The court was not impressed with the logic of the argument that, in its use of the word "stepchild," the legislature had intended to limit its application to a stepchild whose natural parent happened to be alive at the time of his stepparent's death, discriminating against one whose natural parent was deceased at that time. The following language was used:

"Would it be just or equitable to treat the son, who ultimately inherits his property, as stranger to the blood, simply because the tie of affinity is broken? To do so would deny the son a consideration extended by the statute to nephews and nieces." (p. 67.)

As will be demonstrated, the court, emphasizing certain language in the statute, came to the conclusion that this had not been the legislative intention. But, in developing its argument, it used the following words:

"The sole question presented is whether, under Rem. Rev. Stat., § 11202 [P. C. § 7053], Henry J. Bousman takes as a stepson or a stranger to the blood. It is appellant's contention that the relation, by affinity, between Mary E. Bousman and Henry J. Bousman ceased upon the death of the latter's father. The contention is supported by an overwhelming weight of authority. See *Brotherhood of Locomotive Firemen etc. v. Hogan,* 5 F. Supp. 598, which contains

an exhaustive analysis of cases on the subject; also, *In re Sheard's Estate,* 181 Wash. 62, 42 P. (2d) 34.

"Acceding to this rule, it would follow, in the absence of statute providing otherwise, that Henry J. Bousman would take as a stranger to the blood. *In re Marshall's Estate,* 42 Cal. App. 683, 184 Pac. 43; *In re Butcher's Estate,* 267 Pa. 521, 110 Atl. 163. See, also: *Allen v. Cunningham,* 143 Tenn. 11, 223 S. W. 450."

The assertion of the penultimate sentence of the first paragraph in this quotation is, as we have attempted to demonstrate by the foregoing analysis, entirely misleading. Unless the jury and incest cases are lumped together with the insurance cases, the weight of authority does not stand for the proposition that the tie of affinity ceases upon the death of the spouse whose marriage gave rise to it. In their generalized fact situations, *Brotherhood of Locomotive Firemen v. Hogan* and *Allen v. Cunningham* represent, in fact, a minority view. See, in addition to the foregoing discussion of the point, the annotation to *Steele v. Suwalski* at 99 A. L. R. 593. *In re Sheard's Estate,* except by possible inference, does not support the proposition for which it is cited. That case merely held, in connection with the interpretation of the statute involved in the *Bousman* case, that death or divorce does not sever the tie of affinity between one spouse and the blood relatives of the other spouse, if there be issue of the marriage surviving. This was admitted by all parties to the case to be the rule, and there was no occasion to examine it at length or to inquire into a hypothetical situation where no issue survived.

Nor, with the possible exception of *Allen v. Cunningham,* do the cases, cited in substantiation of the concluding sentence, actually support the assertion made therein. At the time the *Bousman* case was decided, there were no cases applying the doctrine in question to the terms of an inheritance tax statute. Neither the *Marshall* case nor the *Butcher* case involved a question of affinity. Both were concerned with the construction of local statutes. In the *Marshall* case, an inheritance tax statute (Inheritance Tax Act, California Laws of 1917, chapter 589, p. 884, § 4, subd.

1) granted an exemption, not in favor of stepchildren as such, but in favor of children to whom the decedent, for not less than ten years previously, had stood in the mutually acknowledged relationship of parent. The court refused to grant the exemption to a stepdaughter who did not fulfill this requirement. The *Butcher* case held that, where a divorced wife left her residuary estate to the daughter of a man to whom she had formerly been married, this legacy came within the terms of a statute (Act of April 22, 1905, P.L. 258) granting a tax exemption to "children of a former husband or wife." For other Pennsylvania decisions similarly construing this statute, see *Lloyd's Estate*, 15 Pa. Dist. Rep. 932; *Seltzer's Estate*, 19 Pa. Dist. Rep. 1070; *Commonwealth v. Randall*, 225 Pa. 197, 73 Atl. 1109; and the lower court's decision in the *Butcher* case, found at 48 Pa. Co. Ct. Rep. 580. It is particularly difficult to see how the *Butcher* decision could have been thought in any way to support the quoted sentence from the *Bousman* case.

The authorities cited in the *Bousman* case, therefore, do little to support its conclusion that, in a case such as the court had before it, it would be required, in the absence of statute, to hold that the tie of affinity between stepmother and stepson had been severed upon the death of the husband and father whose marriage had given rise to it, so that the stepson would be taxed, not as a stepson, but as a stranger. But the court, in any event, after stating this to be the law, proceeded to hold that the principle involved was inapplicable to the case by reason of the language of the controlling statute. It was held that, by the use of the words "being in such relation" after the words "son-in-law" and "daughter-in-law" in the body of the statute and in the proviso, the legislature intended to indicate that *only* these in-laws would actually have to occupy that relation to their parents-in-law at the time of the legacy in order to claim the benefit of the tax exemption. The court stated:

"If these words had been omitted from the statute, the application of the general rule would make sons-in-law, daughters-in-law and stepchildren all strangers to the blood when the tie of affinity is broken. In other words, there

was no necessity for including the words at all if they are to be applied to stepchildren, as well as to sons-in-law and daughters-in-law. In view of the general rule, the words were inserted to serve but one purpose; that is, to make clear a distinction in status between the stepchild and the son-in-law or daughter-in-law in cases where the tie of affinity is broken."

Accordingly, the court found, by necessary implication, that the legislature, in using the word "stepchildren," had intended it to apply to children of one's husband or wife by a former marriage, whether or not the husband or wife had previously died.

In 1935, the legislature amended the statute in question and, among other changes, struck out all exemptions in favor of sons-in-law and daughters-in-law, together with the qualifying phrases "being in such relation" and "being in such relation at the time of the death of said decedent." (Laws of 1935, chapter 180, p. 771.) In 1938, *In re Raine's Estate*, 193 Wash. 394, 75 P. (2d) 933, was decided. In this case, Mary Raine made certain bequests to the sons of her former husband, who had predeceased her. Under the interpretation given to the word "stepchild" in the *Bousman* case, it might have been supposed that the court would have found that these legatees were entitled to the exemption granted to class A beneficiaries. However, the court did not so find; rather, it decided that the omission of the language "son-in-law or daughter-in-law . . . being in such relation," indicated a legislative intent that what had been declared in the *Bousman* case to be the general rule of law, should apply. For the court had said in that case:

"If these words ['being in such relation'] had been omitted from the statute, the application of the general rule would make sons-in-law, daughters-in-law and stepchildren all strangers to the blood when the tie of affinity is broken."

And the court observed in the *Raine* case:

"It will thus be seen that the statute now effective employs the language which we said in the *Bousman* case would, if standing alone, exclude the stepchild from the benefits of the exemption after the bond of affinity had been dissolved by the death of the parent."

Following this rationale, the court held that the legatees were not entitled to take as class A beneficiaries. The result is not easy to understand. In the first place, the implication that the legislature, in order to avoid the broad construction given the word "stepchild" in the *Bousman* case, changed the statute so that it could only benefit those stepchildren whose natural parents happened to survive their stepparents, is quite unwarranted. The *Bousman* case was not yet handed down at the time the above-mentioned change was made in the statute, although it is true that the trial court's opinion in the *Bousman* case, which was based on the same general theory, had been rendered and was then on appeal. See discussion of this point in the *Raine* case at 193 Wash. 398-399. More important, however, the legislature did not merely delete the words "being in such relation," but withdrew the entire exemption in favor of sons and daughters-in-law. The *Bousman* case decided that the legislature had intended the phrase "being in such relation" to refer only to sons and daughters-in-law, and the very fact of its inclusion proved that the legislature had intended to give to the word "stepchild" a meaning broader than that which the court regarded as the usual common-law definition. If the words "being in such relation" referred only to sons and daughters-in-law, it was natural to withdraw them when the exemption in favor of sons and daughters-in-law was taken out of the statute. There was no indication that the legislature thereby intended to change the meaning of the word "stepchild" which, according to the decision of the *Bousman* case, it had originally intended. In fact, the withdrawal of the words "being in such relation," together with the words "to a daughter-in-law or son-in-law," lends support to the idea expressed in the *Bousman* case that this language was intended to limit this relationship alone, and that the legislature, in originally using the word "stepchild," meant to include both stepchildren whose natural parent was alive at the time of the stepparent's death and stepchildren whose natural parent had predeceased their stepparent.

Stepchildren were first given favored treatment in our inheritance tax statutes in 1929, when they were allowed certain exemptions along with other specified relatives. (Laws of 1929, chapter 205, § 1, p. 527.) In 1931, they were placed in the preferred tax rate classification. (Laws of 1931, chapter 134, § 4, p. 403.) In 1935, the presently existing categories for imposition of inheritance taxes, classes A, B, and C, were established. It was at this time that sons and daughters-in-law were removed from the favored group. (Laws of 1935, chapter 180, § 106, p. 770.) Further amendments, of no materiality to the present inquiry, were made in 1939 (Laws of 1939, chapter 202, § 1, p. 692), and in 1943 (Laws of 1943, chapter 277, § 1, p. 870). It is not an abuse of judicial notice to take into consideration the common meaning of the word "stepchild" and to observe that, in point of actual fact, probably not one legislator, of the many who were involved in the passage of these various acts, understood the word to apply only in connection with those children whose natural parent survived their stepparent, or with those children whose natural parent left issue to continue the tie of affinity between them and the surviving stepparent.

The only justification for such an esoteric interpretation is that the legal meaning of "stepchild" requires it as a result of the supposed common-law rule that the tie of affinity is broken upon the death, without issue, of the husband or wife whose marriage gave rise to it. But isolated statements in the legal encyclopedias to the contrary notwithstanding, there is no such absolute principle, and there never has been, either in the English common law, which continued the tie for purposes of forbidding marriage between a man and his affinity relatives, or in the American common law, which has continued it for purposes of holding beneficiaries under insurance policies and workmen's compensation laws competent to take as relatives.

Even if the statements in the legal encyclopedias, and the admittedly overwhelming weight of dicta in the various incest and jury cases, be regarded as having estab-

lished this doctrine as a part of our common law, it still seems most reasonable to conclude, as did the courts in *Hummel v. Supreme Conclave, Lewis v. O'Hair,* and *In re Bousman's Estate,* that the legislature, in conferring this benefit upon stepchildren, did not intend their right to receive it to depend upon the technical question of whether a legally recognized affinity relationship existed between themselves and their stepparents. If any discrimination is to be made among stepchildren, it would seem best to make it upon the basis suggested by *Steele v. Suwalski, Benefield v. United States,* and, indirectly, by *Brotherhood of Firemen and Enginemen v. Hogan,* which indicate that the tie of affinity should only be considered as broken where the stepchild (or other affinity relative) has actually ceased to be a member of the household or family of the surviving stepparent. But even such a classification as this would be pointless where an inheritance tax statute is involved, for there the question of the stepchild's status ordinarily would not arise unless the stepparent had made him a beneficiary in his will; and, normally, this would not occur unless something resembling a parent-child relationship had continued to exist between them after the natural parent's death.

It has been said that taxation is an intensely practical matter, and that laws in respect of it should be construed and applied with a view of avoiding, so far as possible, unjust and oppressive consequences. *Farmers Loan & Trust Co. v. Minnesota,* 280 U. S. 204, 74 L. Ed. 371, 50 S. Ct. 98, 65 A. L. R. 1000. Whether the rule that the tie of affinity is broken upon death is regarded as nonexistent, save in the limited number of situations in which it has customarily been invoked, or whether it is regarded as merely inapplicable to the present type of case, the result is the same, and the unreasonable consequence which appellant reaches, as a result of the artificial and abstract reasoning which has all too often characterized cases dealing with affinity, is avoided. To be sure, such a consequence is inescapable if the *Raine* case is considered controlling.

In its fact situation, the construction of an inheritance tax statute, the *Raine* case is unique in the United States. It represents a novel and unwarranted extension of a principle originally adopted in connection with the qualifications of jurors, extended to apply to the qualifications of judges, and further extended, in the midst of a fog of utter confusion, to establish a dividing line between what is and what is not incest. It is a sport and a mutant, without precedent, and, as far as can be determined, without progeny. We do not agree that it has placed us in a *cul de sac* from which withdrawal is no longer possible; for, reluctant though we may be to overrule our prior decisions, we have never hesitated to do so when, upon reconsideration, we have concluded that they were in error. The *Raine* case is as wrong in principle as it is unfounded in authority. It ought to be, and it is, overruled.

It is said, however, that the legislature has met several times since the *Raine* case was handed down, and that, since it has made no change in the statute with reference to stepchildren, it has apparently acquiesced in the rule set forth in that decision. This is a consideration which is, of course, entitled to great weight. *Lowman & Hanford Co. v. Ervin,* 157 Wash. 649, 290 Pac. 221. Yet, as the court observed in the *Raine* case itself, statutes do not spring up spontaneously in legislative chambers; nor do amendments to statutes. The *Raine* case involved a tax of $943.50. Its magnitude was obviously not of such a degree as would, in ordinary circumstances, provoke or inspire amendment. In fact, Mr. Jenner, who was supervisor of the inheritance tax division at the time the statute as a whole was last amended in 1943, and in whose office the amending bill was drawn up, testified, to the following effect:

"Q. When you drafted the '43 Act which was proposed and submitted to the legislature, did you have in mind that the act at that time provided that some one in Mr. Bordeaux's position would not be placed in the same category as a natural child for inheritance purposes? A. I did not, if I had I would have corrected it. Q. In other words, you would have placed a category that would cover the situa-

tion that Mr. Bordeaux and his brother Russell Bordeaux find themselves now in. A. Yes. Q. As far as exemptions are concerned? A. Yes, sir. Q. And rate of tax? A. Yes, if I could."

The rights of stepchildren have been but slowly established through the years, and always in direct opposition to the common law, "whose fundamental pronouncement is that the mere relationship of stepparent and stepchild confers no rights and imposes no duties." 4 Vernier, American Family Laws, 485, § 268. But the modern tendency has been, and rightly so, to assimilate the stepchild to the natural child. See Note, 52 Harv. L. Rev. 515. Where the legislature has passed a statute which, on its face, appears designed to aid in accomplishing that end, we should not restrict it by resort to abstruse and little-known common-law rules, particularly when such rules, as in this case, are of the most doubtful validity.

We are in agreement with the trial court that the principle that the death of a spouse, without issue, terminates the relationship by affinity, should not be applied to limit the meaning of the word "stepchild," as used in this statute, and that Chester Raymond and Russell Bordeaux should, consequently, be taxed at the same rate as they admittedly would have been taxed had their father or their half-brother survived their stepmother.

The judgment is accordingly affirmed.

ALL CONCUR.

---

January 22, 1951. Petition for rehearing denied.