In re Regin Brian RIBCKE, Debtor.

Robert Joel ZAKROFF,
Trustee Plaintiff,

v.

Jesse MARKSON, Lucille
Markson, Defendants.

Bankruptcy No. 85–A–0876.
Adv. No. 85–0252A.

United States Bankruptcy Court,
D. Maryland at Rockville.

Aug. 20, 1986.

Robert Zakroff, Bethesda, Md., Trustee.

Lawrence Jacobs, Bethesda, Md., for debtor.

## MEMORANDUM OF DECISION

(Cross-Motions for Summary Judgment)

PAUL MANNES, Chief Judge.

Robert Joel Zakroff, Chapter 7 trustee for the bankruptcy estate of Regin Brian Ribcke, has sued Jesse Markson and Lucille Markson alleging that a conveyance of real property by the debtor to the defendants within one year before the debtor's Chapter 7 filing is a preference and therefore may be avoided under 11 U.S.C. § 547. The matter is before the court on cross-motions for summary judgment.

1. *Plaintiff's Motion*—The court finds a genuine issue of material fact exists as to whether the defendants Markson received more by way of the transfer under attack than they would have if the case were a case under Chapter 7 and the transfer had not been made. The court finds a further issue of material fact as to whether or not the debtor was insolvent at the time of the transfer. Therefore, plaintiff's motion for summary judgment is denied.

2. *Defendant's Motion*—The question presented is whether or not defendants were insiders at the time of the transfer since the transfer in question occurred more than 90 days but less than one year before the filing of debtor's petition. *See* 11 U.S.C. § 547(b)(4)(B).[1] If defendants are not classified as insiders, the trustee would be unable to recover against them in a preference action for a transfer made more than 90 days before filing.

The following facts are undisputed:

1. The debtor, Regin Brian Ribcke, filed a voluntary petition for relief under Chapter 7 on May 30, 1985.

2. Robert Joel Zakroff filed his acceptance as the Chapter 7 trustee on June 13, 1985, and is now duly acting in that capacity.

---

1. The applicable statute, 11 U.S.C. § 547(b) provides:

§ 547 *Preferences.*

&ast; &ast; &ast; &ast; &ast; &ast;

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

3. In November, 1977 debtor and his late wife, Judith Markson Ribcke, purchased the property located at 21911 White's Ferry Road, Poolesville, Maryland (sometimes hereinafter referred to as "the farm property").

4. Judith Markson Ribcke was the daughter of the defendants Markson.

5. On August 10, 1978, debtor and Judith Markson Ribcke executed and delivered a mortgage in favor of the Federal Land Bank of Baltimore in the sum of $69,000 secured by the farm property.

6. From 1979 through 1983, the defendants advanced between $160,000 and $170,000 to the debtor and Judith Markson Ribcke and received a deed of trust to secure the loan. The deed of trust was never recorded.

7. Prior to the death of Judith Markson Ribcke, the relations between the defendants and the debtor were strained. Shortly after the death of Judith Markson Ribcke, relations became worse.

8. In the summer of 1984, sometime after the death of Judith Markson Ribcke, debtor abandoned the farm property in order to move into a home purchased by his girl friend. Defendants learned that the first mortgage and real estate taxes were in arrears.

9. In August, 1984, debtor and defendants entered into an agreement whereby, in consideration of the defendants' cancellation of the $170,000 debt owed to them by debtor, the debtor would transfer the property to the defendants and they would pay debtor's debts from the proceeds from the sale of the farm. The transfer was accomplished by a deed dated August 31, 1984, and recorded September 6, 1984.

10. While the debtor in fact had other bills, he told defendants that his only debts consisted of the unpaid mortgage in the sum of $69,000, the Markson debt in the sum of $170,000, and debts listed on plaintiff's Exhibit 4, totalling $17,564.25.

11. At the time of the transfer, defendants believed the fair market value of the farm property to be between $275,000 and $300,000.

"Insider" is defined, insofar as individual debtors are concerned, pursuant to 11 U.S.C. § 101(28)(A) and (37):

§ 101 *Definitions.* In this title—

(28) "insider" includes—

(A) if the debtor is an individual—

(i) relative of the debtor or of a general partner of the debtor;

(ii) partnership in which the debtor is a general partner;

(iii) general partner of the debtor; or

(iv) corporation of which the debtor is a director, officer, or person in control.

(37) "relative" means individual related by affinity or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree.

These definitions are also subject to § 102(3), which states that "includes" and "including" are not limiting.

## DISCUSSION

■ *Consanguinity.* The Marksons and the debtor are not related by consanguinity because they are without a common ancestor. It is said in II *Blackstone* 202:

As the common law doctrine of inheritance depends not a little on the nature of kindred, and the several degrees of consanguinity, it will be necessary to state the true notion of this alliance in blood. Consanquinity or kindred is defined to be *vinculum personarum ab eodem stipite descendentium,* the connection of persons descended from the same stock. It is either lineal or collateral.

More recently, the Court of Appeals stated in the case of *Criminal Injuries Compensation Board v. Remson,* 282 Md. 168, 384 A.2d 58, 66 (1978):

Consanguinity is relationship by blood. *Gossard v. Criminal Inj. Comp. Bd.,* 279 Md. [309] at 311–312, 368 A.2d 443

(1977). It is "the connection of persons descended from the same stock or common ancestor ... and is either lineal or collateral. Lineal consanguinity is that which subsists between persons, of whom one is descended in a direct line from the other.... Collateral relations, like lineals, descend from the same ancestor, or stock, but differ in that they do not descend from each other. Instead they branch out from the common ancestor." 1 P.L. Sykes, Probate Law and Practice § 160 (1956). *See Hoffman v. Watson*, 109 Md. 532, 72 A. 479 (1909); *The State v. Greenwell*, 4 G & J 407 (1832).

 *Affinity.* It has been stated the term "affinity" is not susceptible of precise definition. Broadly speaking, however, affinity may be regarded as the connection existing in consequence of marriage between each of the married persons and the kindred of the other." *See In re Bordeaux' Estate*, 37 Wash.2d 561, 225 P.2d 433, 436 (1950). The doctrine of affinity, derived from both canon and common law, states that husband and wife are united by marriage and become one person. *See Remson*, 384 A.2d at 71. From the unity of husband and wife, one party to the marriage holds by affinity the same relation to the blood relatives of the other as the other stands toward them. *See In re Bordeaux' Estate*, 37 Wash.2d 561, 225 P.2d 433, 436 (1950); 2 Corpus Juris 377, 379.

 The death of Judith Markson Ribcke did not terminate the relationship of affinity between her parents and the debtor because of the fact that a child survived.

"For then the 'tie of affinity' would not have been broken, since the living issue of the marriage in whose veins the blood of both parties was comingled, would have continued to preserve the relationship. *Paddock v. Wells*, 2 Barb.Ch.NY 331; *In re Sheards Estate*, 181 Wash. 62, 42 P.2d 34 [1935]."

*In re Bordeaux' Estate*, 37 Wash.2d 561, 225 P.2d 433, 435 (1950); *Shamberger v. State*, 221 Ala. 538, 130 So. 70, 71 (1930) (Juror disqualification). Likewise, in cases dealing with assessment of inheritance taxes where there are surviving children of the marriage, it is generally held that the relationship of affinity is not terminated by the death of the parent. *See Lavieri, Executor v. Commissioner of Revenue Services*, 184 Conn. 380, 439 A.2d 1012, 1015 (1981); *Depositors Trust Company of Augusta v. Johnson*, 222 A.2d 49, 52 (Me. 1966). The issue occurs more frequently however with respect to insurance policies in finding the relationship of affinity sufficient to create an insurable interest. *See Brotherhood of Locomotive Firemen and Enginemen v. Hogan*, 5 F.Supp. 598, 600 (D.Minn.1934); Annot., 99 ALR 593, "Death or divorce as affecting relationship by affinity as regards insurance." It follows then that the trustee may avail himself of the one-year reach back of § 547(b)(4)(B) because those related within the third-degree of affinity, such as the defendants, are automatically trapped in the category of insider.

 *Insider.* In framing the Code, Congress dealt with a certain class of people differently in preference actions—the insiders. As was stated: "An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." H.R. Rep. No. 595, 95th Cong., 1st Sess. 312, U.S.Code Cong. & Admin.News 1978, p. 5787, 6269 (1977). The Marksons are subject to the label of insiders in this case by virtue of the statutory definition which may be expanded by a factual presentation but never contracted.

 Even were the court not to find any relationship by affinity, there would remain the consideration as to whether the Marksons were insiders in fact. As was noted in the case of *In re Hartley*, 52 B.R. 679, 689 (BC N.D. Ohio 1985):

In support of a liberal definition of the term "insider" the Trustee cites the Court to 11 U.S.C. § 102(3) and *In re Montanino*, 15 B.R. 307 (Bankr.D.N.J. 1981). Section 102(3) provides that the term "includes" is not limiting. The

*Montanino* case found that the parents of the woman the Debtor was living with qualified as "insiders." While the Court agrees the definition of "insider" found at § 101(25) is not all inclusive it does not believe the McComb Bank is an "insider" as contemplated by the Code.

The legislative history of § 101(25) (1978) [current version at § 101(28)] provides that:

> An insider is one who has sufficiently close relationship with a debtor that his conduct is made subject to close scrutiny other than those dealing at arms length with the debtor.

H.R.Rep. No. 595, 95th Cong. 1st Sess. 312, U.S.Code Cong. & Admin.News 1978, p. 5787, 6269 (1977).

The automatic stay and the trustee's avoidance powers, including the power to avoid preferences, are the linchpins of bankruptcy. The Code drafters stated as to preference law:

> The purpose of the preference section is two-fold. First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally. The operation of the preference section to deter "the race of diligence" of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section—that of equality of distribution.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 177–78, U.S.Code Cong. & Admin.News 1978, p. 5787, 6138 (1977). The result compelled by the maxim that "equality is equity" is appropriate because of the overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction. *Bank of Marin v. England,* 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966).

Defendants' motion for summary judgment is also denied.