### In re CLOVERLEAF FARMER'S CO-OPERATIVE, a/k/a Cloverleaf Colony, Debtor.

#### Bankruptcy No. 89–40531–PKE.

United States Bankruptcy Court, D. South Dakota.

May 31, 1990.

Nunc Pro Tunc May 24, 1990.

Jon Haverly, Sioux Falls, S.D., for movant U.S., acting through the Small Business Admin.

J. Bruce Blake, Sioux Falls, S.D., for respondent Debtor Cloverleaf Farmer's Co-op., d/b/a Cloverleaf Colony.

R.P. Murley, Asst. U.S. Atty., Sioux Falls, S.D., for the U.S.

Kay Cee Hodson, Office of the U.S. Trustee, Sioux Falls, S.D., for the U.S. Trustee.

Rick A. Yarnall, Sioux Falls, S.D., Chapter 12 Trustee.

## MEMORANDUM DECISION

PEDER K. ECKER, Bankruptcy Judge.

### ACTION

The Small Business Administration (SBA) filed motions to: 1) dismiss the Chapter 12 petition of Cloverleaf Farmer's Co-operative (Cloverleaf or debtor) on grounds the debtor fails to qualify as a family farmer; 2) obtain relief from the automatic stay so the SBA may offset government crop payments due the debtor; and to 3) sequester rents. Debtor resisted, and, after a hearing which included other matters, these three motions were taken under advisement. The Court holds: 1) the debtor qualifies as a Chapter 12 family farmer pursuant to 11 U.S.C. § 109 (hereafter, the "11 U.S.C." is omitted where a section to 11 U.S.C. is referenced); 2) the SBA may not administratively offset; and

3) the rent sequestration motion is denied. The instant matters are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(B), (G), and (O). This Court has jurisdiction over the parties and subject matters of this action under 28 U.S.C. § 1334. This memorandum constitutes findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52 and Bankr.R. 7052.

## FINDINGS OF FACT

Cloverleaf consists of seven families, a Hutterite colony of seventy-six individuals, living under a co-operative organization formally incorporated June 14, 1977. Cloverleaf's principal officers include: Vice President Herman J. Wipf, Secretary/Treasurer Don J. Hofer, Director Henry Wipf, and Director Phillip Tschetter. Cloverleaf's fourteen equity owners, all of which own a 7.14 percent interest, include Don Hofer, Herb Wipf, John Wipf, Paul Tschetter, Johnny Wipf, Jr., Val Tschetter, Walter Wipf, Phillip Tschetter, Henry Wipf, Josh Hofer, Jake Hofer, Mike Hofer, Johnny Hofer, and Jimmy Wipf. Don Hofer's family tree, depicted in Appendix A, notes Don's family relationship to some stockholders.

Cloverleaf maintains about 1,350 tillable acres. Donald Hofer credibly testified the co-operative actively farms the land. Its members exclusively farmed until the past two difficult years forced some of Cloverleaf's members to work off the farm. Farmed crops include corn, barley, wheat, and beans. Farming equipment is borrowed from a third party because Valley National Bank, in 1989, foreclosed on a delinquent loan, thereby taking collateralized farming equipment and livestock.

Farmers Home Administration's 1977 first mortgage of about $645,000 on debtor's real estate exceeds the collateral's value. The SBA recorded a second mortgage it took on the realty in the county where the property is located when it loaned about $155,100 to Cloverleaf during 1981 and 1982. No financing statement was filed with South Dakota's Secretary of State. The SBA stipulated that, as a junior lienholder, the SBA is fully undersecured as to any equity in the real estate. The SBA's security interest includes rents and profits of the land. SBA Exhibit 6.

Cloverleaf participates in the Agricultural Stabilization and Conservation Service's (ASCS's) Conservation Reserve Program, a government project to conserve and improve farmland. The debtor earned $7,100 under the 1989 ASCS program. By letters in the summer of 1989, the SBA advised Cloverleaf of the SBA's intent to offset the ASCS amount. Apparently, the administrative offset was postponed because, as of the November 9, 1989, Chapter 12 filing date, the offset was inchoate. Post-petition, the debtor received the 1989 ASCS payment. The payment bore no express conditions or reservations. The SBA seeks to administratively offset the ASCS payment received by the debtor. The SBA also claims a security interest in the 1989 ASCS payment and future ASCS amounts by classifying the ASCS payments as rent or profit subject to SBA's filed mortgage which includes rent and profit. SBA's claims are reduced to three issues, addressed seriatim.

## ISSUES

I. Who is included in the family of a Section 101(17) "family farmer" when Section 101(39) defines a relative to include all those related by affinity or consanguinity within the third degree as determined by the common law.

II. Whether the SBA has a right to offset its post-filing claim against ASCS farm payments under Section 553(a) in a reorganization case.

III. Whether ASCS program payments may be characterized as rent or profit.

## DECISION

### I. Family Farmer

Congress enacted Chapter 12 to protect the family farmer entity in which a family is engaged in farming operations while some family members may own the farm but have substantial nonfarm income to sustain themselves. A bankrupt must meet numerous tests to qualify as a Chap-

ter 12 debtor. The burden of proof in establishing eligibility for bankruptcy relief is on the party filing the petition. *Matter of Morgan Strawberry Farm,* 98 B.R. 584, 585 (Bankr.M.D.Fla.1989). A Chapter 12 applicant's debt may not exceed one-and-a-half million dollars, not less than eighty percent of aggregate nonliquidated debts must arise out of the farming operation, and more than eighty percent of aggregate nonliquidated debts must arise out of the farming operation, and more than fifty percent of the farmer's previous year's income must be derived from the farm. 11 U.S.C. § 101(17)–(20). Family farm ownership limits also exist. 11 U.S.C. §§ 101(17), 109.

Subsection (A) of Section 101(17) sets requirements for an individual or individual and spouse to qualify as a "family farmer" and, thus, be eligible under Section 109(f) for Chapter 12. *In re Schaurer Agr. Enterprises,* 82 B.R. 911, 912 (Bankr.S.D.Ohio 1988). Subsection (B) sets the needs for a corporation or partnership to qualify for Chapter 12. The pertinent Subsection (B) requirement demands one family and the relatives of the members of such family own more than fifty percent of the farming corporation. A court may not strain Bankruptcy Code definitions in order to grant statutory family farmer status to entities not squarely fitting Bankruptcy Code requirements. *In re Easton,* 883 F.2d 630 (8th Cir.1989).

Any family farmer, whether individual, partnership, or corporation, must play an active role in the farming operation. *In re Tim Wargo & Sons, Inc.,* 869 F.2d 1128, 1130 (8th Cir.1989); *In re Faber Trust,* 113 B.R. 599 (Bankr.D.N.D.1990); *In re LLL Farms,* 111 B.R. 1016 (Bankr.M.D.Ga. 1990); *In re Dakota Lay'd Eggs,* 57 B.R. 648, 656 (Bankr.D.N.D.1986). A corporation may qualify as a farming operation pursuant to Section 101(17) where the debtor has the risk if the crop fails. *In re Tobin Ranch, Inc.,* 80 B.R. 166, 167 (Bankr.D.Neb.1987). Where the majority of stockholders participate in farming and live on the land and derive substantial portions of their incomes therefrom, it may be considered a family farm eligible for Chapter 12. *In re Garako Farms, Inc.,* 98 B.R.

506 (Bankr.E.D.Cal.1988) (where stockholder majority did not live on the farm and derive substantial income from a dental practice, such an entity was not a farmer). Cloverleaf meets the active role requirement because its members do one hundred percent of the farming and bear all risk of loss.

The word, "co-operative," is not expressly listed as an entity type permitted to file Chapter 12. A co-operative is defined as a corporation or association organized to render economic services without gain to itself or its members who own and control it. *United Grocers, Ltd. v. United States,* 186 F.Supp. 724, 733 (N.D.Cal.1960), *aff'd,* 308 F.2d 634 (9th Cir.1962). A co-operative, in South Dakota, is organized like and subject to rules governing a corporation. S.D.C.L. § 47–15–1, *et seq.* Because a co-operative is a corporate body and a corporation may qualify as a family farmer, Cloverleaf achieves the Bankruptcy Code's qualification of a corporation as a family farmer provided other prerequisites are met. The SBA's sole allegation that Cloverleaf fails to qualify as a family farmer is that Cloverleaf's majority ownership is not held by a single family and the relatives of such family as required by Section 101(17)(B).

The majority stock ownership of a "family farmer" corporation (co-operative) must be held by a family and the relatives and members of such family, not to any other entity. *Tobin Ranch,* 80 B.R. at 167; 11 U.S.C. § 101(17)(B). Congress requires majority ownership in a farming corporation be owned by one family and its relatives because Congress' intent is to protect the small family farm in Chapter 12. *Matter of Burke,* 81 B.R. 971, 976 (Bankr.S.D. Iowa 1987).

The key to family membership is that a "'relative' means individual related by affinity or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree." 11 U.S.C. § 101(39). The definition's terms are not further defined in the Bankruptcy Code. Little legislative history exists as to Congress' intent with respect to the term,

"common law," at Section 101(39). *In re Hydraulic Indus. Products Co.*, 101 B.R. 107, 108 (Bankr.E.D.Mo.1989).

"Consanguinity" means vinculum personarum ab eodem stipite descendentium, the connection or relation of persons descended from the same stock or common ancestor. *Todd v. Ehresman*, 132 Ind.App. 440, 442, 175 N.E.2d 425, 428 (1961); *Chemical Bank & Trust Co. of N.Y. v. Godfrey*, 29 N.J.Super. 226, 227, 102 A.2d 108, 109 (1953); *Brown v. City of Baraboo*, 90 Wis. 151, 152, 62 N.W. 921, 922 (1895); 15A C.J.S. p. 569. The word, "consanguinity," imports blood through some common ancestor. *Garner v. Collins*, 27 U.S. (2 Pet.) 59, 93, 7 L.Ed. 347 (1829). Consanguinity is synonymous with "kindred," whereas "affinity" is the connection between married persons and the kindred of the other. *Bliss v. Tyler*, 149 Mich. 601, 608–09, 113 N.W. 317, 319–20 (1907); *Tegarden v. Phillips*, 14 Ind.App. 27, 33, 42 N.E. 549, 551 (1895); 15A C.J.S. p. 569. Consanguinity typically determines incestuous relationships for marriage seekers, serves as a plan to distribute an intestate's estate, and determines conflicts of interest. *Ex parte Bourne*, 300 Mich. 398, 409, 2 N.W.2d 439, 440 (1942); *Capps v. State*, 87 Fla. 388, 389, 100 So. 172, 173 (1924); 26A C.J.S. §§ 21–22, 562; ABA Model Code of Professional Responsibility, DR 5–101; ABA Model Rules of Professional Conduct, 1.7–.9; ABA Code of Judicial Conduct, Canon 4. Bankruptcy courts commonly use consanguinity to determine insiders. *Hydraulic*, 101 B.R. at 108; *In re Ribcke*, 64 B.R. 663, 665 (Bankr.D.Md.1986).

Consanguinity "degrees" measure the relationship between a person and his relatives. Black's Law Dictionary 381 (5th ed. 1979). Corpus Juris Secundum (C.J.S.) states:

Each generation is called a degree in determining the propinquity of consanguinity of one or more persons to an intestate[.] In reckoning the degrees of consanguinity there are two recognized modes; one, according to the canon law, and the other according to the rules of the civil law. The canon law mode of computation, which is generally said to have been adopted in the common law with respect to the descent of real property[,] although there is some doubt as to this[,] is to begin with the common ancestor and count downward to claimant[;] and the civil law rule is to begin with the intestate, and ascend from him to a common ancestor, and descend from that ancestor to claimant, reckoning a degree each generation, as well in the ascending as in the descending line[.] ... Except in a few states, where it is expressly provided by statute that degrees of kindred shall be computed by the rules of the canon or common law[,] the rule adopted in the various states, either by express statutory enactment or judicial construction, is that of the civil law[.]

26A C.J.S. §§ 22, 562–63. C.J.S. and other sources designate consanguinity measured by the "common law" as a specific measurement technique, whereby degrees between generations are counted only once in a descending manner. Determining degrees varies among jurisdictions since some use the common law method while others use the civil law.

In addition to the historical single count common law method, a bankruptcy court, on the consanguinity issue, used state law to determine consanguinity by reasoning that, under *Erie Ry. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938), state law is applied in the absence of federal common law. *Hydraulic*, 101 B.R. at 108. The court, in *Hydraulic*, found it consistent with the Bankruptcy Code to determine "common law" refers to the body of applicable state law in effect at the time of the suit. *Id.* By statute, South Dakota follows the civil law method of counting degrees, both ascending and descending. S.D.C.L. §§ 29–1–11, –12. South Dakota state judges follow the civil law, having created state common law. Two sets of common law arguably exist: one being the historic, specifically named common law method, and the second being common law as the case law of a state. The Bankruptcy Code provides no express guidance as to which method to use.

■ The Court adopts the "common law" method counting consanguinity degrees only once between generations in a descending manner from a common ancestor when determining Chapter 12 family membership. This single count common law technique applies Section 101(39)'s express language, yields uniform law nationwide, and promotes Congress' policy of limiting Chapter 12 to family operations. Congress expressly used "state" or "local" law where it intended to, such as in Section 522(b)(2)(A). The term, "common law," is precisely used when Congress could have used state or local law if it intended. Unless there is an ambiguity, statutory construction and legislative history cannot be used to alter the clear requirements of the statute. *In re Erickson Partnership*, 856 F.2d 1068, 1070 (8th Cir.1988); *In re Baldwin Farms*, 78 B.R. 143, 144 (Bankr.N.D. Ohio 1987); *In re Shepherd*, 75 B.R. 501 (Bankr.N.D.Ohio 1987). While it is not crystal clear which consanguinity method Congress intended, the statute's express language adds credence to literal interpretation.

The single count common law method provides uniform law across the nation because it specifically denominates one measurement tool applicable among all jurisdictions. To reclassify civil law as the common law would result in nonuniform family farmer qualifications, since some jurisdictions follow the common law and others the civil law method. A family-owned farm may qualify for Chapter 12 in state A but be prevented from filing in state B. This may lead to forum shopping and upsets the United States Constitution's article I, § 8's charge that: "The Congress shall have the Power ... To establish ... underline Laws on the subject of Bankruptcies throughout the United States; ..." (underlining added). The single count common law method does not encroach upon a state's measurement technique because the single count common law technique is used in federal insolvencies.

The single count common law method supports Chapter 12's policy of excluding big businesses. *Burke*, 81 B.R. at 976. At most, the third level of consanguinity includes those sharing a common great-grandparent. Large, diversely owned farming entities are thwarted from Chapter 12. Cloverleaf's members all live on the farm and, except for the last two years, only farmed. Chapter 12 was intended to rehabilitate dedicated family farmers such as this debtor. The single count common law method meets Congress' intent to limit Chapter 12 to one family with relatives farms.

The single count common law method reduces the question of deciding who should be the starting point in measuring consanguinity because the focal individual is not preselected as is the decedent in probate, the person seeking to marry, or the alleged insider in a preference action. Rather than a specific individual, a broad, young base generation can be chosen. Declaring the civil law method as the common law method simply because it is the case law method followed by a state is a circular semantics exercise which ignores the statute's express language, causes a nonuniform definition of the family farmer across the nation, and too narrowly limits Congress' definition of the family farmer. All that remains of this issue is to apply the common law method to the family tree in Appendix A.

■ Applying the single count common law measure of consanguinity starts with Don Hofer's generation, as it appears to be the youngest generation of stockholders. Ascending three degrees leads to Don's great-grandfather, Joseph Wipf. Anyone sharing Joseph Wipf as a common ancestor is within the third level of consanguinity as determined by the common law. Any spouse of such family member also falls within the definition of family member since affinity counts as a relative under Section 101(39). The nine individuals within the third level of affinity or consanguinity, as determined by the common law, are Jake Hofer, Josh Hofer, Johnny Wipf, Jr., Donald Hofer, Walter Wipf, Johnny Hofer, John Wipf, Herb Wipf, and Henry Wipf. These shareholders constitute 9/14's or sixty-four percent of the equity ownership. Cloverleaf meets the statutory requirements

of a "family farmer" since the Don Hofer family owns greater than half of the co-operative's equity.

## II. Administrative Offset

The SBA seeks relief from the automatic stay to pursue an offset against Cloverleaf's 1989 $7,100 ASCS program payment pursuant to the *Rinehart* decisions. In *Rinehart*, the SBA obtained approval from the ASCS to offset ASCS amounts owed to the SBA borrower against its claim before the borrower filed a Chapter 11 reorganization petition. *In re Rinehart*, 76 B.R. 746, 748 (Bankr.D.S.D.1987), *aff'd in part, rev'd in part*, 88 B.R. 1014 (D.S.D.1988), *aff'd in part, rev'd in part*, 887 F.2d 165 (8th Cir. 1989). After the Chapter 11 case commenced, the ASCS offset occurred before the SBA sought relief from the stay to effect the previously approved offset. *Id.* This Court denied the SBA relief from the automatic stay based on a lack of mutual capacity with the ASCS and because policy prevented setoffs in reorganization cases. The Court also found the SBA subject to sanctions for continuing the collection process after debtors filed their Chapter 11 case. *Id.*

On appeal, the United States District Court for South Dakota reversed this Court's conclusion that the two governmental agencies lacked mutuality for purposes of setoff under Section 553 but affirmed this Court's finding that the SBA violated the automatic stay, and the order permitting recovery of damages against the SBA was affirmed. *United States through SBA v. Rinehart*, 88 B.R. 1014, 1016–18 (D.S.D.1988), *aff'd in part, rev'd in part*, 887 F.2d 165 (8th Cir.1989). Since it affirmed the damages award, the District Court held it unnecessary to assess whether the facts before it permitted a Section 553 setoff. *Id.* at 1018–19. The District Court held: "Under section 553, setoff is not mandatory. The bankruptcy court must exercise its equitable discretion in deciding whether to grant creditors' motions for relief from the automatic stay to effect administrative offsets under section 553." *Rinehart*, 88 B.R. at 1018. The District Court never assessed whether *Rinehart's* facts would have permitted a Section 553 setoff.

On appeal, the Eighth Circuit affirmed the actual damage, costs, and fees award because the SBA violated the automatic stay, but reversed as to punitive damages. *In re Rinehart*, 887 F.2d 165, 166 (8th Cir.1989). The Eighth Circuit examined two issues: whether the SBA violated the automatic stay and whether punitive damages were awardable. The Eighth Circuit did not address the policies behind a setoff. The *Rinehart* decision, as modified by the United States District Court and the Eighth Circuit, binds this Court to hold that the SBA and the United States Department of Agriculture, to which the ASCS payment comes forth, stand in mutual capacity and that punitive damages are not awardable because the government has not waived sovereign immunity. *See Hoffman v. Connecticut Dept. of Income Maintenance*, — U.S. ——, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989). The Court now addresses the specific statutory requirements for an offset and policy.

At a minimum, the three requirements for a Section 553 offset are: 1) a debt owed by the creditor to the debtor arose prior to the commencement of a bankruptcy case; 2) a claim of the creditor against the debtor arose prior to the commencement of the bankruptcy case; and 3) the debt and claim are mutual obligations. *In re Brooks Farms*, 70 B.R. 368, 371 (Bankr.E.D.Wis. 1987). Setoff rights created under federal or state laws are recognized in bankruptcy. *See id.* at 368; *In re Sarkis*, 17 B.R. 174 (Bankr.D.S.D.1982). The Debt Collection Act, 31 U.S.C. § 3701, *et seq.*, and 13 C.F.R. § 140 grant offset rights to the SBA. Cloverleaf owed the SBA a sum certain before the bankruptcy petition was filed, and the *Rinehart* decisions render the SBA and ASCS debt and claim as mutual obligations.

Setoff rights are not automatic just because the creditor meets Section 553's requirements. Equitable discretion must be considered when adjudicating whether or not to grant an administrative offset under Section 553. *Rinehart*, 88

B.R. at 1018–19. An administrative offset warrants consideration of solemn policy issues. Reorganization policy concerns, as expressed by this Court in *Rinehart* and not considered by either the District Court or the Eighth Circuit in the appeals of *Rinehart*, were:

> Serious bankruptcy reorganization policy concerns are also raised by this issue. To allow a governmental agency like the SBA, FmHA, or the like to piggyback under the guise of "government" and offset ASCS–CCC farm program payments may effectively deny farmers or ranchers a meaningful opportunity to attempt to reorganize in a Chapter 11, 12, or 13 setting. As stated, in the instant facts, the SBA is totally undersecured in terms of its collateral and would otherwise be treated as secured up to the amount of setoff and ASCS–CCC payments owing. *See* 11 U.S.C. § 506(a) and n. 4. Although the Court is unsure as to the total ASCS–CCC payments owing to the debtors, the SBA's claim is $163,-250.24. Clearly, this impact would be devastating to these farmers and every farmer who, prior to filing, participates in the ASCS–CCC program and owes either the SBA or FmHA at the time of filing. This is contrary to the United States Supreme Court's policy analysis in *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). Addressing the question of what is property of the estate under 11 U.S.C. § 541(a), Justice Blackmun, writing for the majority, observed in part:
>
> > In proceedings under the reorganization provisions of the Bankruptcy Code, a troubled enterprise may be restructured to enable it to operate successfully in the future.... By permitting reorganization, Congress anticipated that the business would continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners. Congress presumed the assets of the debtor would be more valuable if used in a rehabilitated business than if "sold for scrap."
>
> *United States v. Whiting Pools, Inc., supra,* at 203, 103 S.Ct. at 2312. Con-

gress and the President voiced serious concern for family farmer survival in the October, 1986, passage of Chapter 12 bankruptcy reorganization. *See* Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986 which became effective November 26, 1986. *See also In re Erickson Partnership,* 68 B.R. 819 (Bankr.D.S.D.1987), *aff'd,* 74 B.R. 670 (D.S.D.1987) [*rev'd on other grounds,* 856 F.2d 1068 (8th Cir. 1988) ]; *In re Rennich,* 70 B.R. 69 (Bankr.D.S.D.1987) (footnote omitted).

*In re Rinehart,* 76 B.R. at 754–55, *aff'd in part, rev'd in part,* 88 B.R. 1014 (D.S.D. 1988), *aff'd in part, rev'd in part,* 887 F.2d 165 (8th Cir.1989). Policy matters barring the government from an administrative offset in *Rinehart* are potent and vital to the fiscal health of cash-flow-starved reorganizations. Policy concerns justify denying an administrative offset by the federal government. *Matter of Butz,* 104 B.R. 128, 131 (Bankr.S.D.Iowa 1989); *Matter of Mehrhoff,* 104 B.R. 125 (Bankr.S.D.Iowa 1989); *In re Hazelton,* 85 B.R. 400, 405 (Bankr.E.D.Mich.1988), *rev'd on other grounds,* 96 B.R. 111 (E.D.Mich.1988).

It would be inconsistent with the rehabilitative purpose of the Bankruptcy Code and with Congress' efforts at saving the family farm to allow government agencies to pursue an administrative offset in the context of a reorganization case. An administrative offset would have a chilling effect on reorganization chapters. Debtors depending on ASCS payments to meet expenses, without interference from other agencies from which they borrowed monies, should not find themselves, upon filing a reorganization chapter, to be unceremoniously stripped of one of their means by which they may effectuate a plan of reorganization. *Butz,* 104 B.R. at 130. Reorganizations are encouraged by denying the administrative offset.

Section 553's right to setoff treats the claim of the party seeking the setoff as a secured claim under Section 506(a). The effect of a setoff, in the instant case, treats the SBA, who is otherwise fully undersecured in terms of equity in the real estate,

as a secured creditor to the amount of any ASCS payment owing the debtor. Permitting the SBA to leapfrog its undersecured claim into secured status to the extent of the ASCS payment detrimentally affects otherwise similarly situated creditors. The SBA's motion for relief from the stay to initiate administrative setoff procedures is denied.

■ The disbursement of ASCS funds to Cloverleaf distinguishes the instant matter from *Rinehart* and serves as an additional reason the SBA cannot set off. By the time the Court heard the SBA's request for an administrative offset, the ASCS funds were already disbursed without any reservations or conditions. An offset cannot occur unless funds to be set off are in existence in a location where the creditor may effect setoff. *In re Learn*, 95 B.R. 495, 496 (Bankr.N.D.Ohio 1989); *Matter of Moody & Newton, Inc.*, 71 B.R. 55, 57 (Bankr.M.D.Fla.1987). The SBA never sought an order from this Court or had the United States Department of Agriculture conditionally release the ASCS funds. Because ASCS funds disbursement occurred before the motion for relief from the automatic stay to permit an administrative offset was heard, the SBA lacked a source of funds to offset.

### III. Rent Sequestration .

■ "Rent and profit" are terms the SBA inserted in its mortgage filed in the county where the debtor's land is located. The SBA argues that debtor's ASCS Conservation Reserve Program participation constitutes mere rent or profit so as to fit within the real estate mortgage.

Conservation Reserve Program participation has been held to not constitute rent. *In re Koerkenmeier*, 107 B.R. 195, 198 (Bankr.W.D.Mo.1989). Agricultural payments have also been held as rent. *In re Waters*, 90 B.R. 946, 970 (Bankr.N.D.Iowa 1988); *In re Harvie*, 84 B.R. 197, 199 (Bankr.D.Colo.1988); *In re Clark*, 82 B.R. 131, 132 (Bankr.D.Colo.1987); *In re Ratliff*, 79 B.R. 930, 932 (Bankr.D.Colo.1987). *Waters* and *Harvie* reasoned that, since the Conservation Reserve Program's statutes

and contracts often refer to the terms, "rents" and "rental," the ASCS program constitutes rent. *Waters*, 90 B.R. at 969–70; *Harvie*, 84 B.R. at 199–200. This argument places form over the substance of the ACSC program, ignoring the parties' intent and the underlying transaction. *Koerkenmeier*, 107 B.R. at 195. Merely labeling a contract as rent does not create a lessor-lessee relationship. *Id.* The validity of the SBA's claimed security interest hinges on whether this creditor perfected its security interest.

Generally, perfection is controlled by state law. *In re Hogg*, 76 B.R. 735, 744 (Bankr.D.S.D.1987), *aff'd*, 877 F.2d 691 (8th Cir.1989). Specifically, federal, rather than state, law is the nonbankruptcy law controlling the manner in which a federal lender perfects its security interest in rent. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979); *United States v. Landmark Park & Associates*, 795 F.2d 683, 684 (8th Cir.1986). Absent a Congressional directive, consensual liens on chattels arising from federal government lending programs are determined under nondiscriminating state law. *Kimbell*, 440 U.S. at 740, 99 S.Ct. at 1464. Perfection requirements are eased, not eliminated, for federal lenders to shield them from the barrage of diverse state laws in perfecting a security interest in rents. *Landmark*, 795 F.2d at 687. The affirmative act of recording loan documents is essential to perfect a security interest in rents. *Id.* Recording debt documents affords other creditors notice of the federal creditor's security interest.

S.D.C.L. § 44–1–4 permits a lien to arise by contract. SBA's mortgage, covering rent and profit, is not a germane real estate matter. The SBA intended a security interest in these non-realty items. Article 9 governs transactions intended to create a security interest in chattels. U.C.C. § 9–102 (U.C.C. sections referred to are those adopted by South Dakota and are found in the South Dakota Codified Laws by adding "57A–" to the U.C.C. section cited); *see In re Midas Coin Co.*, 264 F.Supp. 193 (E.D.Mo.1967), *aff'd, Zuke v.*

*St. John's Community Bank,* 387 F.2d 118 (8th Cir.1968); *Rushmore State Bank v. Kurylas, Inc.,* 424 N.W.2d 649, 652 (S.D. 1988). However, an interest in rent and a security interest subject to any federal statute are excluded from Article 9 in South Dakota. U.C.C. § 9–104. While not subject to Article 9, the SBA must adequately notice commercial lenders of its interest.

Recognizing a lien in chattels as perfected, despite a failure to adequately describe the collateral or provide notice to third parties, at best, inflicts redundancy because all creditors must check local, as well as central filings, and, at worst, validates a secret lien. Commercial lending would be destroyed by such recognition because the credibility of the notice filing system is wrecked if haphazard filing and unreasonable collateral descriptions perfect. Subjecting the SBA, a federal lender, to minimal requirements of reasonably describing collateral and noticing others of a security interest aptly balances the need to protect federal lenders from a maze of differing complex state laws, yet avoids paralyzing commercial lending because secured lending functions on the simple principle of providing notice to other lenders. *In re D.G. & Assoc., Inc.,* 9 B.R. 94, 96 (Bankr.E. D.Tenn.1981). At minimum, a federal lender seeking to perfect a security interest in chattels must adequately describe collateral and file a financing statement where it provides notice to third parties.

Security interest perfection in an agricultural program requires the collateral be reasonably defined. *In re Kingsley,* 865 F.2d 975, 976 (8th Cir.1989); *In re Schneider,* 864 F.2d 683, 685 (10th Cir.1988); *In re Sunberg,* 729 F.2d 561, 562 (8th Cir.1984); *Matter of Mattice,* 81 B.R. 504, 506 (Bankr. S.D.Iowa 1987). A defective financing statement fails to perfect a security interest. *In re Vital Breathing Products, Inc.,* 98 B.R. 97, 100 (Bankr.N.D.Ga.1988); *Hogg,* 76 B.R. at 744, *aff'd,* 877 F.2d 691 (8th Cir.1989).

The collateral the SBA claims a security interest in is Cloverleaf's contract with an ASCS program denominated as the Conser-

vation Reserve Program. 7 C.F.R. § 701, *et seq.* This program assists farmers in conserving and improving the soil and water resources of their farms by converting such land to permanent vegetative cover. 7 C.F.R. § 704.1. The Conservation Reserve Program is one of numerous United States Department of Agriculture programs targeted at specific national goals. *See Kingsley,* 865 F.2d at 975; *Sunberg,* 729 F.2d at 561 (diversion program gives commodities to farmers who convert land to non-crop use); *see also* 7 U.S.C. § 1441 (deficiency program compensates farmers for not producing certain crops to maintain the crops' competitive market positions); 7 C.F.R. § 700, *et seq.* (rural clean water program). Conservation Reserve Program farmland enriches the environment by achieving quality topsoil and water.

Each United States Department of Agriculture program, as codified in the C.F.R., details rules geared to achieve the particular program's goals. One rare, common agricultural program provision is that payment may be in cash, in-kind, in commodity certificates, or in any combination of such methods. 7 C.F.R. §§ 704.17, 770. Conservation Reserve Program participation is intended for ten years and limited to not more than twenty-five percent (25%) of a county's cropland, and a comprehensive conservation plan is adopted. 16 U.S.C. § 3831; 7 C.F.R. §§ 704.5, .9. Diverse agricultural programs, each uniquely tailored to a specific Congressional goal, indicate the ASCS program Cloverleaf contracted for is not a simple crop subsidy. *Kingsley,* 865 F.2d at 981. Labeling the Conservation Reserve Program as mere rent or profit oversimplifies the complex agricultural program.

"Profit" and "rent" are inadequate to perfect a lien in a government farm crop program. *Overland Nat'l Bank of Grand Island v. Olson,* 101 B.R. 134, 141 (Bankr. D.Neb.1989). "Profit" is defined as valuable results, the excess of revenues over expenditures. *United States v. Mintzes,* 304 F.Supp. 1305, 1312 (D.Md.1969). Profit covers nearly all successful commercial ventures. Accepting profit as an adequate collateral description would eliminate more

specific classifications. *See* U.C.C. §§ 9–105, –109. This has not occurred because collateral descriptions are valid, useful, and serve to limit a creditor's security interest so that a borrower's non-collateralized assets may be used to secure further credit. Profit is too vague a term to include Cloverleaf's ASCS program. Classifying the ASCS program as rent or profit stretches the definition of these terms beyond reasonable interpretation.

A real estate lease is a contract by which the lessor gives the lessee temporary possession and use of real property for reward and the lessee agrees to return such property to the lessor at a future time. S.D. C.L. § 43–32–1. Conservation Reserve Program land is not possessed by the government, and land involvement for a ten-year period exceeds a temporary use in light of typical farm leases being year-to-year in this state.

The SBA-cited case, *United States v. Landmark Park & Associates*, 795 F.2d 683 (8th Cir.1986), illustrates why "rent" is an inadequate description of Cloverleaf's ASCS program. *Landmark* involved rents accruing from lessees in a mobile home park. *Id.* at 684. Loan documents contained a clause assigning all rents, profits, and income to the creditor. *Id.* The debtor and the creditor contemplated the monthly lease payments as collateral. *Landmark* involved leased trailer space which is legally understood simply as rent, whereas the environmental program Cloverleaf associated with fails to squarely fit as rent. The SBA's security interest in debtor's ASCS program payments is not perfected because the collateral is not reasonably described.

A creditor and a farmer negotiating a loan both know about farm support programs and the particular terminology current at the time. *Kingsley*, 865 F.2d at 981. It is a simple matter for a creditor desiring a security interest in such programs to use the definitional terms. *Id.* This is especially true where the lender is a federal government agency, here the SBA, since the agency stands in mutuality, as a matter of law, to the Department of Agriculture administering the farm program. *Rinehart*, 88 B.R. at 1016, *aff'd in part, rev'd in part*, 887 F.2d 165 (8th Cir.1989). All parties clearly understand what collateral is intended when carefully tailored documents, rather than preprinted forms, are used.

The predictability and stability of commercial transactions demand a federal lender record loan documents to perfect a security interest in rent. *Kimbell*, 440 U.S. at 728–30, 99 S.Ct. at 1458–59; *Landmark*, 795 F.2d at 687. The proper place to perfect a security interest in South Dakota for all chattels, except timber to be cut or minerals, is in the Office of the Secretary of State. U.C.C. § 9–401. Congress recognized the value of centralized filing by requiring financing statements on farm products to be filed with a state's secretary of state. 7 U.S.C. § 1631. Federal lenders acknowledge this chattel filing practice provides notice, as they centrally file financing statements. *Waters*, 90 B.R. at 952. Adequate notice of a security interest in a farm program is critical in heavily agricultural states such as South Dakota. Exempting the SBA out of adequate notice requirements would disrupt commercial relationships predicated on state law. *Kimbell*, 440 U.S. at 729, 99 S.Ct. at 1459. Central filing places a minimal task on the federal lender to perfect its security interest in rent and serves notice to other creditors. Centrally filed financial statements describing farm collateral may be easily obtained. U.C.C. § 9–407.1.

Despite Article 9's nonapplicability to rents and a federal program, it is difficult to imagine an easier method for a federal lender to perfect a security interest in rents which still gives notice to other creditors. Filing is not a difficult procedure and, since all states follow the overall structure of the U.C.C., Article 9 provisions are easy to locate. No discriminating barrage of difficult multi-state law differences among the states arises with this small requirement. No overriding federal interest to exempt out a federal lender from the requirement of properly filing its security interest exists. *Kimbell*, 440 U.S. at 727, 99 S.Ct. at 1457. Properly filing a financ-

ing statement balances aptly the need to lighten federal creditor rent perfection burdens and still notices commercial lenders. *Landmark*, 795 F.2d at 687. The SBA failed to perfect its security interest since its mortgage failed to put other creditors on notice of its contractual lien.

■ Section 552 is dispositive of the collateral classification for years after 1989 even if ASCS program payment was considered rent. Property acquired by the debtor after the commencement of the case is not subject to any lien from a security agreement entered into by the debtor before the case was started. 11 U.S.C. § 552(a). Unless the case's equities warrant otherwise, a security agreement in rents or profits entered into before the bankruptcy petition was filed is a valid security agreement to the extent provided by such security agreement and by applicable nonbankruptcy law. 11 U.S.C. § 552(b).

Section 552's scheme, in essence, means that a bankruptcy filing severs prepetition interests with the important exception that security interests in property acquired prior to filing extend to proceeds of such property acquired after filing. *Mattice*, 81 B.R. at 507. The question is whether this exception applies to post–1989 ASCS program payments but for the disposition of the SBA's security interest not being perfected, as rent and profit inadequately describe the Conservation Reserve Program and misfiling the financing statement.

The decisions of *Mattice*, 81 B.R. at 504, and *In re Fowler*, 41 B.R. 962 (Bankr.N.D. Iowa 1984), ruled that the creditor had no interest in agricultural programs consummated after the petition date because the debtor did not acquire program benefits until after the commencement of the bankruptcy case. *Id.* Section 552(b) only applies to "property of the debtor acquired before the commencement of the case and to proceeds ... of such property." *Id.* An executed contract is a prerequisite to Conservation Reserve Program participation. *See* 7 C.F.R. § 704.11 (duties and contracting procedures). Cloverleaf was irrevocably committed only for the 1989 ASCS program. While the Conservation Reserve Program is engineered as a ten-year program, the debtor may reject the executory contract pursuant to Section 365. The debtor would need to apply for subsequent ASCS program participation, and, until its application is approved, no rights to payments arise. Therefore, Cloverleaf's right to post–1989 payments arise after commencement of its Chapter 12 case. Like the 1989 ASCS payment as held above, the SBA has no interest in post–1989 ASCS program payments.

The Court shall enter an appropriate order.

## ORDER DENYING MOTION TO DISMISS VOLUNTARY CHAPTER 12 BANKRUPTCY PETITION, ORDER DENYING RELIEF FROM THE AUTOMATIC STAY FOR PURPOSES OF AN OFFSET, AND ORDER DENYING MOTION TO SEQUESTER RENTS

Pursuant to the Memorandum Decision executed this date, it is hereby

ORDERED that the Small Business Administration's (SBA's) motion to dismiss Cloverleaf Farmer's Co-operative's (Cloverleaf's) voluntary Chapter 12 bankruptcy petition is denied; it is further

ORDERED that the SBA's motion to obtain relief from the automatic stay so that the SBA may offset government crop payments due Cloverleaf is denied; and it is also further

ORDERED that the SBA's motion to sequester rents is denied.

**1022**

*Indicates shareholder status in Cloverleaf Farmer's Co-operative.