**In re UNITED MARINE
SHIPBUILDING,
INC., Debtor.**

**Michael B. McCARTY, as Trustee for
United Marine Shipbuilding, Inc.,
Plaintiff,**

**v.**

**NATIONAL BANK OF ALASKA, N.A.,
United States Depart. of Transportation
acting by and through the Maritime Administration, and Evergreen Leasing,
Inc., Defendants.**

**Bankruptcy No. 94–00542.
Adv. No. A95–05466.**

United States Bankruptcy Court,
W.D. Washington.

July 9, 1996.

Beth Cook, Department of Justice, Washington, DC, Diane E. Tebelius, United States Attorney, Seattle, WA, for DOT/Maritime Administration.

Bruce W. Leaverton, Seattle, WA, for Evergreen Leasing.

Kimberly W. Osenbaugh, Seattle, WA, for National Bank of Alaska.

Michael B. McCarty, North Bend, WA, for Plaintiff.

## MEMORANDUM OPINION ON MOTIONS FOR SUMMARY JUDGMENT

KAREN A. OVERSTREET, Bankruptcy Judge.

This matter came before the Court on February 8, 1996, on the cross-motions for summary judgment filed by each party in the case. Each party has asserted a right to two Internal Revenue Service ("IRS") refund checks received by the Trustee, Michael B. McCarty (the "Trustee"), after the commencement of this case. The checks were made payable to United Marine Shipbuilding, Inc. ("UMSI") and were in the total amount of $1,019,572.85 (collectively, the "Tax Refunds"). The Trustee has deposited the checks into his bank account and is holding the funds pending this Court's decision.

## I. *BACKGROUND*

A detailed factual background is necessary to understand the competing claims of the parties to the Tax Refunds. The following facts were taken from the submissions of the various parties and are undisputed. All parties have agreed that this case can and should be resolved on summary judgment.

### A. *The Parties.*

1. *The Debtor.* The debtor, UMSI, is a corporation that was created in connection with reorganization proceedings filed in 1986 by WFI Industries, Inc. ("WFI"), Marine Power and Equipment, Inc. ("MPE"), Marine Logistics Corporation ("MLC"), Alaska Marine Towing, Inc. ("AMT"), Services Specialties, Inc., Propulsion Systems, Inc., International Offshore Services, Inc., and Gulf Stevedoring, Inc. (collectively, the "Original Debtors"). On August 8, 1988, the Court confirmed the Original Debtors' Third Revised Joint Plan of Reorganization (the "Plan"). The Plan created three reorganized companies (collectively referred to herein as the "Reorganized Debtors"), in which the business and assets of the Original Debtors, as specifically set forth in the Plan, were to be vested. The newly created companies were Unimar International, Inc. ("UII"), the new parent company; UMSI, a subsidiary of UII organized to conduct the Original Debtors' shipyard operations; and United Marine Tug & Barge Co. ("UMTB"), a subsidiary of UII organized to conduct the tug and barge operations of the Original Debtors.[1]

On January 21, 1994, UMSI filed this proceeding initially under Chapter 11. This proceeding was then converted to a Chapter 7 proceeding on April 15, 1994. None of the other Reorganized Debtors has commenced a bankruptcy proceeding.

2. *The Trustee.* Michael B. McCarty was appointed as the trustee in this case on April 21, 1994.

3. *National Bank of Alaska, N.A.* In early 1985, National Bank of Alaska, N.A. ("NBA") extended a $10 million line of credit to some or all of the Original Debtors, including WFI and MPE. At the time of the Original Debtors' Chapter 11 filing, NBA had a perfected security interest in, among other things, all of the Original Debtors' general intangibles, including any tax refunds to which any of the Original Debtors were entitled. NBA was owed approximately $10 million on the date the Original Debtors filed Chapter 11.

4. *Evergreen Marine Leasing, Inc.* In July of 1990, after confirmation of the Plan, Evergreen Marine Leasing, Inc. ("Evergreen") loaned money to UMSI, and UMSI granted to Evergreen a security interest in all of its personal property, including tax refunds, to secure the loan. As of the petition date in this case, UMSI owed Evergreen principal and interest in excess of $821,000.

4. *The Government.* The United States Department of Transportation, acting by and through The Maritime Administration ("MARAD"), had financed MLC's acquisition of tugboats and other vessels. MARAD was owed in excess of $72 million at the time the Original Debtors filed bankruptcy. In the Original Debtors' proceeding, MARAD claimed entitlement, by way of offset, to a federal tax refund of approximately $1.2 million owed largely to MPE and WFI, both of

---

1. The Confirmation Order (as defined below) modified the creation of these entities, but UII, UMSI, and UMTB were still the only Reorganized Debtors. *See infra* at pp. 973–74.

which had guaranteed MLC's debt to MAR-AD.

#### B. *The Original Debtors' Chapter 11 Proceedings.*

##### 1. *The Dispute Between MARAD and NBA.*

In the bankruptcy proceedings of the Original Debtors (the "First Bankruptcy"), MARAD claimed that it was entitled to a federal tax refund owed to MPE and WFI. NBA also claimed the refund as part of the general intangibles covered by its security agreement. The dispute between NBA and MARAD was converted to an adversary proceeding. On cross motions for summary judgment, Judge Volinn determined on February 12, 1988, that MARAD had a right to the tax refund by way of offset under Section 553.[2] At the time of Judge Volinn's ruling, however, the automatic stay of Section 362 prohibited MARAD from exercising the setoff. NBA appealed Judge Volinn's ruling to the district court.

##### 2. *The Plan.*

The Plan was confirmed on August 3, 1988, before the district court had issued its ruling on the appeal of Judge Volinn's order. The only provision in the Plan dealing specifically with tax refunds of the Original Debtors provides:

> *Class 4* Pre–Petition Taxes
>
> Withholding taxes owed by WFI and subsidiaries will be offset by the tax refund owed to Debtors which the IRS agrees is far in excess of its withholding tax claim. The disposition of the balance of the tax refund is subject to a dispute between MARAD and NBA, but in any event UII will not receive the balance above the offset amount.

Plan, p. 6. The sections of the Plan that describe the treatment of NBA and MARAD under the Plan do not make any specific reference to tax refunds.

The Original Debtors' Third Amended Disclosure Statement to Debtors' Revised Joint Plan of Reorganization (the "Disclosure Statement") provides as follows with respect to tax refunds:

> The Debtor does not contest its payroll tax obligations which are estimated by the IRS to be $955,295.58. Payment will be made from an income tax refund owed to the Debtors which the IRS has agreed is worth at least $1.2 million. The balance of the refund is subject to a dispute between NBA, (who claims the refund as a general intangible) and MARAD (who claims NBA did not properly perfect its claim), and will not be available to the Debtors.

Disclosure Statement, p. 16. The only collateral of NBA that was dealt with under the Plan was the Northlake Shipyard, which UMSI was going to operate after confirmation of the Plan. UMSI agreed to pay $1.3 million to NBA for the shipyard, which obligation was evidenced by two promissory notes. The Plan provided that as to the rest of NBA's collateral, the "Debtors [defined in the Plan as the Original Debtors] and their shareholders" were to deliver to NBA all of its prepetition inventory, receivables and general intangibles. Plan, p. 16.

Under the Plan, UMTB was to retain 19 vessels subject to MARAD's lien, in exchange for executing two notes totaling $45 million in principal amount in favor of MARAD. The Plan states that MARAD had repossessed by foreclosure all of the other vessels subject to its liens. *See* Plan, pp. 13, 14.

The Order Confirming Plan of Reorganization, approved by Judge Volinn on August 3, 1988 (the "Confirmation Order"), provides as follows in Paragraph 8, on page 19:

> On the Effective Date, except as otherwise provided in the Plan, and any Plan Document, or in this Confirmation Order, all of the property of each Debtor's estate, except property sold or transferred pursuant to the Plan and Plan Documents, shall vest in the Reorganized Debtors as provided in the Plan and shall be free and clear of all Liens, security interests, encumbrances, claims, and interests of any kind.

---

**2.** Unless otherwise indicated, all Chapter, Section and Rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* and to the Federal Rules of Bankruptcy Procedure, Rules 1001 *et seq.*

Although the Plan provided for the incorporation of three new entities, the Confirmation Order amended the Plan by providing that the Original Debtors would be merged and renamed as follows: (i) WFI changed its name to UII; (ii) several subsidiaries were merged into MPE, with MPE as the surviving corporation being renamed UMSI; and (iii) several subsidiaries were merged into AMT, with AMT as the surviving corporation being renamed UMTB.

### 3. *Post–Confirmation Events.*

Although confirmation of the Plan terminated the stay as to MARAD's asserted right of setoff, the district court had not at that time affirmed MARAD's setoff right. On March 29, 1989, the district court affirmed Judge Volinn's order granting MARAD a setoff right against the tax refunds at issue in the Plan. At that time, however, the amount of the tax refunds had not been finally determined by the IRS, so MARAD still could not make the setoff. On December 13, 1988, MARAD sent a letter to the IRS notifying it that the bankruptcy court had ordered that any tax refunds due the Original Debtors, after the IRS had deducted any offset to which it was entitled, belonged to MARAD. In the letter, MARAD provided an address where the refunds should be sent once determined. *See* Exhibit A to Declaration of Kathleen R. Dunn.

On or about April 4, 1990, NBA's financing statement, which perfected its interest in tax refunds, lapsed due to nonrenewal. Three months later, in July of 1990, Evergreen became a post-confirmation lender to UMSI and UMSI granted Evergreen a security interest in all of its personal property including its tax refunds. Evergreen duly perfected its security interest on September 20, 1990.

### C. *The UMSI Bankruptcy Proceeding.*

As noted above, UMSI commenced this proceeding on January 21, 1994, and the conversion to Chapter 7 occurred on April 14, 1994. On January 2, 1995, seven years after MARAD notified the IRS of its right of setoff against tax refunds of the Original

Debtors, the Trustee received two checks from the IRS. These checks represent the tax refunds that were at issue in the First Bankruptcy and are the Tax Refunds at issue in this proceeding. The Trustee is holding the funds pending the outcome of this case.

### 1. *The Release of the Tax Refunds by the IRS.*

The IRS provides the following explanation of how the Tax Refunds were paid to the Trustee. First, based upon a tax return filed by UMSI in July of 1994, the IRS Service Center in Ogden, Utah (the "Service Center") changed the "taxpayer's" address to: United Marine Shipbuilding, Inc., care of the Trustee. It is not clear from the declarations filed by the IRS which corporate entity was the original "taxpayer." In any case, the taxpayer had originally been assigned the identification number of 91–0831222. When the UMSI bankruptcy proceeding was converted to Chapter 7, the Service Center "inadvertently" removed computer controls that had originally been placed on the taxpayer's account to freeze tax refund credits until a determination of the entity entitled to the funds. The freeze occurred because of the First Bankruptcy and the dispute between MARAD and NBA over the Tax Refunds. The inadvertent removal of the freeze controls resulted in the generation of the refund checks that were sent to the Trustee. The Tax Refunds represent refunds due on two Tax Forms 1120 for the periods ending March 31, 1978 and March 31, 1979. The IRS claims that the Tax Refunds were sent by mistake because the same tax identification number was used and the computer controls were mistakenly lifted from the account.[3]

In addition, prior to the issuance of the Tax Refunds, the IRS offset $59,945.16 from the refunds, representing outstanding tax debts of the Original Debtors and for UMSI for the periods ending March 31, 1977, March 31, 1986, and December 31, 1993. The Trustee claims that this setoff was in violation of the stay.

---

**3.** The events surrounding the release of the Tax Refunds are set forth in the Declaration of James

Landerdahl, filed by the IRS.

None of the parties has challenged the IRS' explanation of how the Tax Refunds were released, or that the release of the refunds was inadvertent. Instead, each party offers its own theory as to why, as a matter of law, they are entitled to the refunds. The Trustee commenced this adversary proceeding to determine the competing claims to the funds.

### 2. *The Competing Claims to the Tax Refunds.*

The Trustee claims that the Tax Refunds are property of the estate, and that his right to the funds is superior to the rights of the defendants. He claims that by disbursing the funds to UMSI, the government lost or waived its right to offset those funds against the debt owed by the Original Debtors to MARAD. The Trustee further claims that NBA lost its right to the funds when its perfected security interest in general intangibles lapsed prior to the commencement of the UMSI bankruptcy proceeding. Finally, the Trustee claims that he has superior rights to the funds versus Evergreen, because the funds constitute postpetition proceeds of Evergreen's prepetition collateral to which Evergreen's prepetition security interest did not attach pursuant to Section 552.

NBA claims that MARAD failed to exercise its right of setoff, therefore the doctrines of waiver, estoppel, and laches bar MARAD's claim to the Tax Refunds. NBA further contends that by virtue of the Plan terms, if the refunds were not paid to MARAD, the Original Debtors were then required to turn the funds over to NBA. NBA contends that UMSI has no right to the refunds, because the funds were previously disposed of under the Plan, and that the funds are therefore not property of the estate subject to the rights of either the Trustee or Evergreen.

Evergreen's claim to the Tax Refunds is based on a straightforward commercial law theory. It claims a first priority, validly perfected security interest in substantially all of the personal property of UMSI, including any tax refunds. Evergreen contends that because the government waived its right to the funds, and because NBA's security interest in the funds lapsed, it now has a senior interest in the funds.

## II. JURISDICTION

This Court has jurisdiction of these proceedings pursuant to 28 U.S.C. § 1334 and this is a core proceeding under 28 U.S.C. § 157 to determine property of the estate.

## III. DISCUSSION

■ One issue is *res judicata* here: that MARAD had a right of setoff against the Tax Refunds prior to the issuance of the Tax Refunds by the IRS. That issue was determined by Judge Volinn and affirmed by the federal district court. The only issue here is whether MARAD validly exercised that right, or whether it lost that right as a result of its inadvertent payment of the Tax Refunds to the Trustee. That issue was not raised before Judge Volinn or the district court because the IRS had not yet released the Tax Refunds. Therefore, the issue could not have been litigated or determined prior to the commencement of this action and neither collateral estoppel nor *res judicata* applies to prevent litigation of that issue in this proceeding.

■ This Court concludes that because the release of the Tax Refunds by the IRS was a mistake, MARAD has not lost its right to the Tax Refunds, and the Trustee must pay those funds to MARAD. Accordingly, I hold that NBA, the Trustee and Evergreen have no valid claim to the funds.

### A. *The Claims of Evergreen and the Trustee.*

■ The Court agrees with NBA, that Evergreen and the Trustee have no valid claim to the Tax Refunds. The rights of Evergreen and the Trustee depend upon a finding that the Tax Refunds are property of the UMSI bankruptcy estate. While the Plan was not drafted as precisely as it could have been in describing the disposition of the Tax Refunds, it is clear that the intent of the Plan was that any remaining tax refunds were disposed of to NBA and MARAD, as their respective rights were determined by the district court. Therefore, the Reorganized Debtors, including UMSI, did not obtain any right to tax refunds of the Original Debtors after confirmation. Thus, the Tax

Refunds are not property of the UMSI estate.

The Confirmation Order expressly provides that the order and the Plan are binding upon all parties thereto. The order further provides that any property of the Original Debtors not disposed of under the Plan terms would vest in UII, UMTB or UMSI as described in the Plan. This Court finds that the Tax Refunds were disposed of under the Plan. The Plan specifically states that "The disposition of the balance of the tax refund is subject to a dispute between MARAD and NBA, *but in any event UII will not receive the balance above the offset amount.*" (emphasis added). The only omission from the language is a reference to the other two Reorganized Debtors. UII was the parent entity, however, and as such the most likely entity to receive any tax refund on behalf of the consolidated corporate group.

## B. *The Claims of MARAD and NBA.*

NBA advances two similar, but different, propositions in support of its priority over MARAD. First, NBA argues that a creditor who fails to take affirmative action to effect its right of setoff waives that right. Under this waiver argument, any creditor who pays the funds it holds against which its setoff right can be asserted, whether mistakenly or intentionally, waives its setoff right. Second, NBA argues that the setoff right depends upon the creditor's possession of a fund owing or belonging to the debtor, against which the setoff can be made. Under this possessory fund argument, the right of setoff exists only as long as a fund remains in the hands of the creditor against which the setoff may be asserted. Once that fund is released by the creditor, it loses its right of setoff simply because the fund against which the setoff can be made is gone.

MARAD, citing considerable authority in its defense, argues that waiver is a knowing, voluntary, and intentional relinquishment of a known right. It argues that waiver cannot be applied to deprive it of its right of setoff when the payment of the fund against which its setoff right could be asserted was released by mistake. MARAD does not distinguish between the waiver argument and the possessory fund argument.

There is considerable case law supporting NBA and MARAD; however, no court has articulated a clear rule of application in cases such as this one. In addition, neither party has cited a Ninth Circuit decision that would mandate a particular result in this case.

### 1. *Waiver, Estoppel and Laches.*

MARAD does not argue that the doctrine of waiver cannot be asserted against it as a matter of law. Instead, it argues that to apply that doctrine, I must find a voluntary or intentional relinquishment of its setoff right. Because the release of the Tax Refunds was a mistake, MARAD contends that there was no waiver. MARAD relies on two cases involving a right of setoff asserted by the government. In *In re Lanny Jones Welding & Repair, Inc.,* 106 B.R. 446 (Bankr.E.D.Va.1988), the debtor was a subcontractor of the Small Business Administration ("SBA") under a contract between the SBA as prime contractor and the Federal Aviation Administration ("FAA"). The FAA was to make payments directly to the debtor. After work was completed on the project, the IRS recorded a notice of federal tax lien against the debtor. One month later, the IRS sent notice to the SBA of its right of offset against the funds due the debtor on the subcontract. The IRS also sent notice of levy to the FAA. Two months after the debtor filed its Chapter 11 petition, the FAA sent a check to the debtor's previous counsel in the amount of $86,000. Holding that the setoff right of the IRS was superior to the claim by the insurance company issuing the contractor's bond to the debtor, the court concluded simply that: "The inadvertent act of the FAA in releasing $86,000.00 of the retained funds to the debtor did not diminish or extinguish the set-off claim of the IRS." *Id.* at 449. The court engaged in no detailed analysis of the setoff question, but merely cited *In re Krieger Steel Sections, Inc.,* 103 F.Supp. 351 (E.D.N.Y.1951), *aff'd,* 207 F.2d 83 (2d Cir.1953), *cert. denied,* 346 U.S. 923, 74 S.Ct. 309, 98 L.Ed. 416 (1954) and *In re Ram Industries, Inc.,* 80–1 U.S. Tax Cas. (CCH) p. 9406, 1977 WL 1344 (S.D.Iowa 1977) in support of its conclusion.

In *Ram Industries,* during the Chapter 11 proceeding of the debtor, an officer of the debtor advised the IRS that it could set off the amount of a tax refund due the debtor against taxes then owed by the debtor to the IRS. After the case was converted, but prior to the appointment of a trustee, the IRS "inadvertently" issued a draft in the full amount of a refund due the debtor and mailed it to the trustee. A secured creditor with a security interest in the debtor's accounts receivable claimed a prior right to the funds in the trustee's possession. The court noted that there was no dispute that the payment by the IRS was inadvertent. Citing *Krieger,* the court concluded that the IRS had a superior right to the funds. The court's decision, however, does not contain any analysis of the waiver issue.

*Krieger* likewise contains virtually no legal analysis in support of the conclusion in that case. In *Krieger,* the bankruptcy referee found that a subordinate in the IRS inadvertently, and in violation of established IRS procedures, paid to the trustee the amount of interest on overassessments against the debtor, when a valid claim of the IRS existed for taxes then owed by the debtor. The referee concluded that the government could not lose its right of offset because a "sovereign" cannot lose its rights by estoppel or waiver. The State of New York and the debtor's attorneys claimed competing liens against the funds. On a petition for review, the district court stated:

> It seems to me that it would be a wrong and dangerous course to hold that the rights of the government to taxes (whether in a direct proceeding to collect them or in a proceeding where the right of setoff exists) can be lost by the erroneous and inadvertent action of a subordinate in the Bureau of Internal Revenue. I have always believed that it was horn-book law that a sovereign cannot lose its rights by estoppel or by waiver.

*Id.* at 355.

The cases cited by NBA, the Trustee and Evergreen in opposition to the government's right of setoff in this case are equally inapposite. For the most part, in those cases the creditor asserting the right of setoff had released the funds against which the setoff could be made *before* asserting its setoff right in court or otherwise. For example, in *In re Litchfield Construction Management, Inc.,* 137 B.R. 98 (Bankr.D.Conn.1992), the bank paid to the trustee the funds in the debtor's account at the time of the bankruptcy filing when the trustee demanded those funds. Six months later, after discovering that it would have had a right of setoff, the bank asserted its right of setoff against the trustee. The court denied the bank's setoff. There were no facts in the case indicating that the bank originally paid the funds to the trustee by mistake or that at the time it made the payment it was even aware of its setoff right. Likewise, in *In re Gehrke,* 158 B.R. 465 (Bankr.N.D.Iowa 1993), the court denied a bank's right of setoff because the bank failed to assert that right for a year and a half after it had turned the funds over to the trustee. The bank paid the trustee without mentioning any right of setoff. The court stated:

> However, before a claim that is subject to setoff may be treated as a secured claim, the creditor must first assert the right of setoff and establish that the debts involved are prepetition mutual obligations. Once established, the right to setoff is treated as an allowed secured claim under 11 U.S.C. § 506(a).

*Id.* at 469. Unlike the creditor in the *Gehrke* case, MARAD in this case did just what the *Gehrke* court would have required it to do— assert the right of setoff before payment of the fund and establish mutuality of the debts.

Other cases cited by the Trustee, NBA and Evergreen can be distinguished on the same basis. *See, e.g., Cumberland Glass Manufacturing v. De Witt and Co.,* 237 U.S. 447, 456, 35 S.Ct. 636, 639, 59 L.Ed. 1042 (1915) (Creditor took no action until after payment); *In re Mauch Chunk Brewing Co.,* 131 F.2d 48, 49 (3d. Cir.1942) (Creditor did not assert its right before releasing the fund); *In re Royal Crown Bottling Company of Boaz, Inc.,* 29 B.R. 52, 53 (N.D.Ala.1981) (Bank did not know of or did not assert setoff right before it paid the funds to trustee); *In re Cloverleaf Farmer's Co–Op,* 114 B.R. 1010, 1018 (Bankr.D.S.D.1990) (Funds had already

been disbursed before setoff right was asserted); *In re Wilson,* 49 B.R. 19 (Bankr. N.D.Tex.1985) (Facts not clear that Small Business Administration asserted right of setoff in bankruptcy before IRS paid tax refund to trustee). In all of these cases, the so-called "mistake" was the creditors' payment of the funds against which a setoff could be made without recognizing or asserting the right of setoff. The mistake in this case occurred because of a computer error that resulted in the automatic issuance of the Tax Refunds, not because the government failed to recognize that it had a right of offset against those refunds.

The Trustee also cites two cases where the government lost its setoff right by taking affirmative action inconsistent with that right. In *In re Holder,* 182 B.R. 770 (Bankr. M.D.Tenn.1995), the United States Customs Service objected to a proposed settlement between the Chapter 11 trustee and the IRS, which compromised and settled the claims of the IRS, including a refund. Customs claimed that it was entitled to a setoff against the tax refund. The Chapter 11 confirmed plan, however, incorporated an agreement between the debtor and Customs regarding Customs' claim, which did not include any reference to a setoff. Both the plan and the disclosure statement mentioned the possibility of a tax refund. The court held that Customs had a valid setoff right, but waived that right by entering into an agreed order with the debtor in the plan, by failing to object to the plan, and because the IRS agreed to pay the refund to the estate. In another case, *In re Medina,* 177 B.R. 335, 350 (Bankr.D.Or.1994), the court acknowledged the government's common law right of setoff, but found that the government had waived its right in that case by affirmatively permitting the debtor to use cash collateral, which would have constituted the funds against which the government could have exercised its setoff right. The government in this case took no affirmative action of the type described in the foregoing cases.

■ All of the foregoing cases repeat the general rules applicable to setoffs: A creditor waives its right of setoff unless it takes affirmative steps necessary to effectu-

ate offset. A creditor waives its right of setoff by conduct that is inconsistent with exercising the right of setoff. The right of setoff is purely an equitable remedy that is favored in the law. I find no waiver in this case. MARAD took appropriate steps to effectuate its right of offset by litigating in the bankruptcy and the district courts, and by notifying the IRS of its right. The inadvertent release of the funds by the IRS to the Trustee does not qualify as an act by the government inconsistent with exercising a right of offset so as to amount to a waiver of that right.

■ Having concluded that waiver does not apply to bar the government's claim here, I must determine whether either the doctrine of laches or estoppel applies. I agree with MARAD that the doctrine of laches cannot be asserted against the government under the facts of this case. This conclusion is well supported by case law. *See, e.g., United States v. Summerlin,* 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940); *United States v. Menatos,* 925 F.2d 333, 335 (9th Cir.1991); *United States v. McLeod,* 721 F.2d 282, 285 (9th Cir.1983). I also agree with the government that it is not subject to the defense of estoppel unless there is affirmative misconduct on the part of government employees acting within the scope of their employment. *Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 59–61, 104 S.Ct. 2218, 2223–25, 81 L.Ed.2d 42 (1984); *United States v. Vahlco Corp.,* 720 F.2d 885, 893 (5th Cir. 1983). Affirmative conduct is intentional, wrongful behavior, such as the government's misrepresenting or concealing material facts from another person. *See, e.g., United States v. Ruby Co.,* 588 F.2d 697, 703–04 (9th Cir.1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979); *Lavin v. Marsh,* 644 F.2d 1378, 1382–83 (9th Cir. 1981). No such affirmative misconduct on the part of the government has been shown here. Therefore, I conclude that the defense of estoppel does not apply.

2. *The Possessory Fund Argument.*

■ The possessory fund argument advanced by NBA finds support in the case law

and in Section 506(a) of the Bankruptcy Code. Under Section 506(a), a creditor is treated as a secured creditor as long as it retains a right of setoff—the fund against which the setoff can be made being the creditor's collateral. In two cases cited by NBA, this theory was used by courts to invalidate an asserted right of setoff without any reference to waiver. *See In re Cloverleaf Farmer's Co–Op., supra; In re Royal Crown Bottling Company of Boaz, Inc., supra.* As noted above, however, in both of these cases the funds against which the setoff could have been made were released by the creditor before the setoff right was asserted.

Another case cited by NBA is not as easy to distinguish. In *In re McCormick,* 1993 WL 246001, 1993 U.S.Dist. LEXIS 9692 (D.Kan.1993), the court used waiver and Section 506(a) to find that the government had lost its setoff right. Prior to bankruptcy, the debtors had executed contracts with the Commodity Credit Corporation ("CCC") under the Conservation Reserve Program. The Farmers Home Administration ("FMHA") had made a prepetition loan to the debtor in the amount of $75,000. The FMHA notified the debtors of its intent to seek an administrative offset due to their default on the FMHA's loan, and asked the Agriculture Stabilization and Conservation Service ("ASCS") to set off $72,459.78 against amounts due the debtors from the CCC. Before the setoff occurred, the debtors filed bankruptcy. The FMHA filed a proof of claim and moved for authority to exercise its right of setoff. Before the motion was heard, the ASCS sent partial payments to the trustee on two contracts, then later sent two more payments to the trustee. The court held that the FMHA had waived its right of setoff by paying funds to the trustee and that tender of payment by the ASCS resulted in a waiver of the FMHA's secured claim in offset amounts. The court noted that the FMHA had not contended before the bankruptcy court, as it did on appeal, that the government could not waive its rights under the holding of *Krieger.* Therefore, the district court held that that argument could not be considered on appeal. Nevertheless, the court stated that it was not persuaded by *Krieger* and it believed that the

government could waive setoff rights (citing *Cloverleaf* and *Wilson, supra*). The court also held that because the FMHA waived its right of setoff, it had no secured claim under Section 506(a).

Unlike in the other cases cited by NBA, the FMHA in *McCormick* clearly asserted its setoff right in the bankruptcy proceeding by moving for authority to make the setoff *before the payments were made by the ASCS.* The FMHA also notified the ASCS of its setoff rights. The one distinguishing feature of *McCormick* is that the facts are not clear as to whether the FMHA made the argument that the payments by the ASCS were mistakenly made. The court found that the ASCS "voluntarily and without reservation made the payments to the trustee...." *McCormick,* 1993 WL 246001, at 2. Thus, the court made no specific finding that the payment was mistakenly made, as I have found here.

The court in *McCormick* did not treat the possessory fund theory and Section 506(a) as a separate basis for disallowance of the FMHA's setoff right. Instead, the court's holding was based on waiver—that because the FMHA had waived its right to effect its setoff by release of the funds against which its right could be asserted, it no longer had a secured claim or possessed a fund against which the setoff could be asserted.

I find that the possessory fund argument made by NBA is not a separate basis for invalidating MARAD's setoff right in this case. The argument merely states the result of the application of the waiver doctrine— that is, if the creditor has waived its right to exercise the setoff by releasing the fund, it no longer has a right of setoff. Because the government mistakenly released the Tax Refunds in this case, I hold that it has not waived its right to effect a setoff against the Tax Refunds notwithstanding that at this point in time, it does not possess funds against which its setoff right can be asserted.

### 3. *The Government's Failure to Comply with Regulations.*

■■■ NBA has also argued that the government's right of setoff must be denied because it failed to comply with its own regulations in asserting its setoff rights.

The only regulation cited by NBA is 26 C.F.R. § 301.6402–6, which requires an agency to (i) notify the taxpayer that a debt is past due and will be referred to the IRS if not paid; (ii) provide the taxpayer· with at least 60 days to present evidence that the debt is not owed; (iii) provide the IRS with (a) the name and identifying number of the taxpayer responsible for the debt, (b) the amount of the debt, (c) the date on which the debt became past due, and (d) the designation of the federal agency referring the debt. In this case, MARAD litigated its right to the setoff before Judge Volinn and in the district court on appeal. Its right of setoff was upheld by both courts and the IRS was so notified. The Original Debtors, to whom any refund belonged, had more than ample opportunity to contest the debt to MARAD. To the contrary, under the terms of the Plan, the Original Debtors gave up their right to the Tax Refunds. NBA likewise had ample opportunity to dispute MARAD's debt and right of setoff. MARAD's letter of December 13, 1988 provided the IRS with the information that it needed concerning the debt owed to .MARAD, including a copy of Judge Volinn's Memorandum Decision filed on February 12, 1988. Given these facts, I find that even if the government was required to comply with these regulations (and I do not decide that issue), the government's actions within the constraints of the bankruptcy process, in particular the automatic stay, sufficed to provide substantive compliance with these regulations. Therefore, I find no basis to disallow the government's setoff right because of these regulations.

### C. The Trustee's Independent Obligation to Return the Tax Refunds.

MARAD cites numerous cases in support of the proposition that without regard to its setoff right, the Trustee has a duty to return to the IRS the Tax Refunds that were mistakenly paid to him. See, e.g., United States v. Wurts, 303 U.S. 414, 415, 58 S.Ct. 637, 638, 82 L.Ed. 932 (1938) ("Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid." IRS paid refund to taxpayer who had no right to it.); DiSilvestro v. United States, 405 F.2d 150, 155 (2d Cir.1968) ("It is, of course, well established that parties receiving monies from the Government under a mistake of fact or law are liable ex aequo et bono to refund them, and that no specific statutory authorization upon which to base a claimed right of set-off or an affirmative action for the recovery of these monies is necessary." Payments made by Veterans Administration to applicant who falsified records.); Mt. Vernon Cooperative Bank v. Gleason, 367 F.2d 289, 291 (1st Cir.1966) (Veterans Administration paid for applicant who falsified papers). In those cases, there was no asserted right of setoff by the government and the government appears to have been duped into making the payments mistakenly to the wrong party or to a party who had no right to the funds. Thus, although those cases can be distinguished from the case at hand on that basis, they still support the general proposition that the government is entitled to recover payments mistakenly made.

In this case, the Trustee, NBA and Evergreen each assert a right to monies in excess of a million dollars merely because a computer glitch in the IRS Service Center resulted in the mistaken payment to the Trustee. Such a windfall to any of these parties would not be appropriate.

### D. The Trustee's Claim that the IRS Violated the Stay.

Because the Court has determined that the Tax Refunds are not property of· the UMSI bankruptcy estate, the IRS did not violate the stay when it set off $59,945.16 in tax liability. Of the amount set off, $56,678.51 for the period ending March 31, 1977 and $2,496.60 for the period ending March 31, 1986, relates to periods prior to the confirmation of the Plan. Arguably, the $770.05 set off by the IRS relating to the period ending December 31, 1993, is for a period following confirmation and relating to the operations of UMSI and the Reorganized Debtors. Those debtors had no liability for that tax debt, so arguably the IRS had no right to make a setoff of that amount. That is a claim for MARAD to raise, however, and it has not done so. The only issue raised in this pro-

ceeding is the violation of stay argument by the Trustee, and that claim must be denied.[4]

### CONCLUSION

For the foregoing reasons, the Court finds that MARAD has a superior interest in the Tax Refunds and an order shall be entered requiring that the Trustee pay those funds directly to MARAD.

---

4. The Trustee also argues that because of the alleged violation of stay, the government has "unclean hands" justifying denial of its setoff right. Having concluded that the government did not violate the stay, I do not need to decide this issue.

